**PACIFIC GRAPE PRODUCTS CO., a Corporation, Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 13561.**

United States Court of Appeals, Ninth Circuit.

Feb. 10, 1955.

Samuel Taylor, Walter G. Schwartz, San Francisco, Cal., Andrew W. Kopperud, Chicago, Ill., for petitioner.

H. Brian Holland, Asst. Atty. Gen., Loring W. Post, A. F. Prescott, Meyer Rothwacks, Ellis N. Slack, Sp. Assts. to Atty. Gen., Charles W. Davis, Chief Counsel, Internal Revenue Service, Washington, D. C., for respondent.

Before DENMAN, Chief Judge, and STEPHENS and POPE, Circuit Judges.

POPE, Circuit Judge.

Petitioner is a canner of fruit and fruit products. It regularly billed its customers for all goods ordered by them, but not yet shipped and remaining in petitioner's warehouse, on December 31 in each year. It accrued upon its books the income from the sales of such unshipped goods in the taxable years ending on the days of such billing. On the same date it also credited to the accounts of brokers the brokerage due on account of sales of such unshipped goods, and accrued the cost of such unshipped goods including therein the anticipated cost of labeling, packaging and preparing the same for shipment. For many years the petitioner reported its income ac-

cordingly. (It filed its returns on the calendar year, accrual basis.)

The Commissioner, in determining deficiencies for the years 1940 to 1944, held petitioner's method of accounting did not clearly reflect its income[1] and made adjustments by excluding from the computation of income for the years 1939, 1940 and 1941, the sales prices of unshipped goods billed on December 31 of those years, and included such amounts in the computations of income for the years 1940, 1941 and 1942 respectively. He likewise transferred to these later years the brokerage fees and the estimated costs mentioned which related to these goods.[2] The result was a deficiency in income tax for the years 1940 and 1943, and in excess profits tax for the years 1940, 1941, 1942 and 1944, and in declared value excess profits tax for the year 1944.[3] The determinations mentioned were upheld by the Tax Court on petition for redetermination.

Since its organization in 1926 petitioner has operated its cannery at Modesto, California. Its product was limited to fruit and fruit products. Its canning season in each year extends from about July 1st to November 1st. During such season it enters into numerous contracts for the sale of its current pack. All of the contracts are in writing upon a uniform contract form adopted by the Canners League of California. All of

1. 26 U.S.C.A. 1946 Ed. § 22(c): "Inventories. Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

26 U.S.C.A. 1946 Ed. § 41: "General rule. The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of

accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year."

2. He also transferred some expenses relating to goods sold to the United States, from 1944, when deduction was claimed, to 1945.

3. Petitioner also claimed it overpaid its excess profits tax for 1941 and 1944.

the petitioner's sales, other than to the United States Government, and with the exception of sales of minor quantities known as "spot sales", were made on this contract form, which was in general use by most members of the canning industry in California. The same contract form was also approved from year to year by the National-American Wholesale Grocers Association which included the leading wholesale grocers of the United States. The forms referred to were in each case signed by both the petitioner as seller and the buyer.

The contracts described the quantity, price, grade, size of cans, and variety of fruit or fruit products to be sold. Some provided for labels bearing petitioner's name; others provided for the use of labels bearing the buyer's trade name, in which case the labels were furnished by the buyer to whom an allowance was made for the labels. A large portion of the goods covered by the contracts are shipped during the calendar year in which the fruits are packed. On occasion some buyers request petitioner to withhold shipment of all or part of their contract amounts until the following year and petitioner normally complies with such request. In that connection the contract form used provides: "Goods to be shipped in seller's discretion as soon as practicable after packing. * * * If seller shall elect to withhold shipment at buyer's request, then the goods unshipped shall be billed and paid for on the following dates respectively hereinafter specified. * * Fruits, Fruit Products or Sundry Vegetables, December 31." Accordingly goods remaining unshipped on December 31 of each year were billed by the petitioner to their respective buyers on that date.

On December 31 of each year the petitioner always has on hand a sufficient quantity of goods of every variety, grade and size of can to fill all contracts. They are kept in five warehouses owned by petitioner at Modesto. These are leased to warehouse companies and operated as bonded warehouses. The fruits of different varieties, grades and sizes of cans were separately arranged in separate stacks with no commingling of variety, grade or size in any one stack. It was stipulated in the Tax Court that all of the canned fruits and fruit products here involved were fungible goods within the meaning of the Uniform Sales Act and sections 1721 to 1800 of the California Civil Code. The evidence showed that in accruing and entering upon its books in these years the expense of brokerage fees, petitioner calculated the amount of such fees in accordance with the customary trade practice of the California canning industry. That practice was to accrue the expenses of such fees as of the dates the unshipped goods were billed. With respect to the expenses of shipment of the goods, that is, the cost of labeling, packing and freight, it accrued and entered upon its books as an item of deduction the anticipated cost of these items. What the cost would be was known from the petitioner's past experience with such expenditures.

[1] The Tax Court, six judges dissenting, upheld the Commissioner's determination that the method employed by the petitioner of computing accrued income from its sales did not clearly reflect its income 17 T.C. 1097. The court based its conclusion entirely upon its determination that title to the goods in question did not pass to the buyers on the billing dates. The Tax Court said: "It appears from the evidence that petitioner's method of computing accrued income from the sales was in accordance with the method of accounting it regularly employed in keeping its books. Accordingly, the question for determination is whether the method employed by the petitioner clearly reflected its income. (Section 41, supra.)" After a reference to the circumstances of the sales, including the fact that the purchase price had not been paid, nor the goods cased or labeled on December 31 of each year, the court concluded: "Under such circumstances we are convinced that it is incumbent upon the petitioner

to prove that the particular goods in question were sold and title passed to its buyers on the billing dates if it is to sustain its position that the method of accruing the income from these sales clearly reflected its income."

The Tax Court recognized, as the parties had stipulated, that since the contracts in question were entered into and performed in the State of California, the question whether the title to the goods passed on the billing dates is to be determined in accordance with the law of that State. The court came to the conclusion that under California law title did not pass. In this we think that the Tax Court was in error.

California has adopted the Uniform Sales Act, Civil Code §§ 1721–1800. We note at the outset that considering the situation of the goods, the parties and the terms of the contracts, there was no necessary obstacle to the passage of title to the goods in question upon the date of the billing. It should be noted that the goods were sufficiently ascertained to meet the requirements of § 1737 of the Civil Code, which provides that: "property in an undivided share of ascertained goods may be transferred as provided in section 1726." § 1726, identical with § 6 of the Uniform Sales Act, provides for a sale of an undivided share of goods and that "In the case of fungible goods, there may be a sale of an undivided share of a specific mass, though the seller purports to sell and the buyer to buy a definite number, weight or measure of the goods in the mass, and though the number, weight or measure of the goods in the mass is undetermined."[4] As we have noted, the parties

stipulated in the Tax Court that these were fungible goods within the meaning of this statute.

We do not understand the decision of the Tax Court to be that it was impossible to treat these goods as fungible goods under the circumstances of this case. What the Tax Court said was that there was lacking evidence that the parties intended to pass title in a share of an undivided mass of goods. In other words, that it was not established that there was an intent that these be treated as fungible goods.

It is upon this conclusion as to what the demonstrated intent of the parties was that we part company with the Tax Court. As stated by Mr. Williston, (Williston on Sales, Rev.Ed. § 159), the modern American doctrine relating to fungible goods is not limited to such things as grain, oil or wine, but it has been applied to goods in cans, bales, or barrels. California early adopted that view. Horr v. Barker, 6 Cal. 489; Horr v. Barker, 11 Cal. 393.

Unquestionably whether, in a given case, title has passed, depends upon the intention of the parties, however indicated. Such is the provision of § 1738 of the California Civil Code, § 18 of the Uniform Sales Act, which recites that for the purpose of ascertaining this intention "regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case". We have previously alluded to the contract provision with respect to shipments withheld at buyer's request, namely, that the goods unshipped should be billed and

---

**4.** "§ 1726. Undivided shares. (1) There may be a contract to sell or a sale of an undivided share of goods. If the parties intend to effect a present sale, the buyer, by force of the agreement, becomes an owner in common with the owner or owners of the remaining shares.

"(2) In the case of fungible goods, there may be a sale of an undivided share of a specific mass, though the seller purports to sell and the buyer to buy a definite number, weight or measure of the goods in the mass, and though the number, weight or measure of the goods in the mass is undetermined. By such a sale the buyer becomes owner in common of such a share of the mass as the number, weight or measure bought bears to the number, weight or measure of the mass. If the mass contains less than the number, weight or measure bought, the buyer becomes the owner of the whole mass and the seller is bound to make good the deficiency from similar goods unless a contrary intent appears."

866

paid for on December 31. This is the uniform contract form of the Canners League of California used for many years by the predominant number of members of the California canning industry, and a form approved by the Wholesale Grocers Association which includes the leading wholesale grocers of the United States. The Tax Court found: "It was the common understanding of the members of the California canning industry that where the standard contract form was employed title to the unshipped goods passed on the billing dates, regardless of the method employed in billing. The standard accounting procedure employed by the canning industry was to record on such billing dates sales of the unshipped goods and also the amount of unpaid brokerage fees applicable to such sales, as well as the estimated cost of shipping the goods."

The court, however, declined to give effect to the usage or custom thus found to have existed in the canning industry for it stated in its opinion: "Petitioner's evidence has failed to establish as a fact that buyers placed the same interpretation on their agreements with respect to the passage of title as did the canners." All of the evidence, without contradiction, was to the effect that all who dealt with canners in this California market,—buyers and brokers, as well as canners,—understood as a matter of custom and usage in the industry that the contracts referred to goods in stacks segregated by varieties, qualities and sizes of cans but not otherwise identified or segregated as belonging to particular customers, and that it is the custom and usage of all such parties to assume that the goods belonged to the purchaser

from the time of such billing. As one thoroughly qualified witness testified, the canners who signed the uniform contract, as a matter of trade practice or custom, considered that the right to the selling price accrues on December 31 and title passes at the same time under the clause in the contract mentioned. Likewise, he testified, the buyers, the brokers, and "everyone else concerned with the transaction" fully understood the contract as effecting passage of title in the same manner, and at the same time. Other witnesses testified to like effect and there was no testimony to the contrary.[5]

We think it was not permissible for the Tax Court as the finder of facts to accept the testimony relating to the trade usage, custom and common understanding as adequately establishing that this understanding existed on the part of the canners but to reject it and disbelieve it insofar as it purported to be the understanding of the buyers as well. As a matter of law and under the California decisions, it must be held that the understanding arising from the usage and custom referred to became a part of the contracts and bound both canners and buyers. California Civil Code, § 1655 provides: "Stipulations which are necessary to make a contract reasonable, *or conformable to usage,* are implied, in respect to matters concerning which the contract manifests no contrary intention." (Emphasis added.) We think it to be a sound rule and one established in California, that a person dealing at a particular market is held to have dealt in accordance with the customs and usages of that market, and this without further proof of such person's knowledge of the usage.[6] As stat-

5. The respondent Commissioner called one witness who produced a ledger sheet which he testified disclosed entries indicating that when he purchased canned fruits from the petitioner he did not carry them as inventory from the time they were billed to him. Upon cross-examination it developed that this witness was testifying with respect to "spot sales" of merchandise which he immediately re-

billed to his buyer. As was stipulated, no such "spot sales" are involved in this case.

6. See Restatement of the Law of Contracts, § 248(2): "Where both parties to a transaction are engaged in the same occupation, or belong to the same group of persons, the usages of that occupation or group are operative, unless one of the parties knows or has reason to know

ed in Hostetter v. Park, 137 U.S. 30, 40, 11 S.Ct. 1, 4, 34 L.Ed. 568: "It is well settled that parties who contract on a subject-matter concerning which known usages prevail incorporate such usages by implication into their agreements, if nothing is said to the contrary." See the statement of this court in accord, Murphy v. Warner Bros. Pictures, 9 Cir., 112 F.2d 746, 748. The leading California case is Miller v. Germain Seed & Plant Co., 193 Cal. 62, 222 P. 817, 818, 32 A. L.R. 1215. That case dealt with what the court called "The general custom of all seed dealers, including the defendant, to refuse to warrant the character of the seed sold by them." The court held that a purchaser who dealt with such a dealer was bound by the custom and said, 222 P. 822: "It is conceded in this case that if the purchaser knew of the custom he could not recover, and the court so instructed the jury. This being conceded, the only remaining question is whether a purchaser who contracts with dealers in seed is bound by such a general custom of the seed trade, even if ignorant of the custom. A customer cannot by his mere ignorance of a general custom of nonwarranty impose upon a dealer a contract of warranty which he never intended to make and which the slightest inquiry would disclose to the purchaser was not intended to be made."

The rule there stated requires us to hold that the buyers who dealt with the canning industry in which the common understanding found by the Tax Court prevailed, were by virtue of that fact, parties to the same understanding. In the light of this California rule, the finding of the Tax Court that the buyers did not have this understanding that

the title to the goods thus in stock in the warehouses passed to them on the date of billing was clearly erroneous.[7]

The custom or trade practice here referred to was described by the witnesses as one universally employed in the California canning industry with respect to unshipped fruits and fruit products such as those here involved. The testimony was that this understanding and trade practice related to goods which were not physically segregated, customer by customer, but which were stacked in the warehouse in the manner we have previously described. The understanding was therefore that the goods were to be treated as fungible goods and that title passed on the date of the billing.

It is true that the goods here had to be labeled, packed and shipped at a subsequent date. Such a circumstance is a matter to be taken into consideration in ascertaining the intention of the parties as to when the property in the goods is to pass under Rule 2 of the California Civil Code, § 1739, § 19 of the Uniform Sales Act. But that circumstance is not controlling, for all of the rules specified in that section are subject to the initial qualification of the section,—"unless a different intention appears", etc. Not only is the different intention indicated by the proof of the custom here referred to, but the language of the contract provides that the goods unshipped shall be billed and paid for on December 31. While there is no evidence to show that the buyers actually paid for those goods on December 31, (the implication is quite otherwise), yet the contract clearly specifies that payment was due on that date, which would further confirm an understanding that title had then passed.[8]

that the other party has an inconsistent intention."

7. The Tax Court treated another trade practice quite differently. Referring to the evidence of a trade practice relating to methods of billing customers, the Tax Court said: "Petitioner's evidence establishes the existence of such trade practices in the canning industry and we believe that the same should be given effect

as being part of its contracts with its buyers."

8. The Tax Court found some impediment to the passing of title, in that "although it has not been definitely established, a substantial quantity of the goods was probably under pledge as security for loans when they were billed." The stipulations disclosed that goods were billed to some buyers with drafts attached and

Since title had thus passed to the buyers, it is plain that petitioner's method of accounting and accruing in such years its gross income from sales of such merchandise clearly reflected its income. Consistently, and to make reflection of income complete, it properly accrued its shipping expenses relating to this merchandise as part of its cost of goods sold in the respective years billed. The record shows that the items making up these expenses were either precisely known or determinable with extreme accuracy. Labels and cases for packing were on hand. The expenses of labor in labeling and casing were determinable on the basis of petitioner's past experience. Freight costs were available from published rate schedules. It is plain therefore that this case is governed by the rule stated in United States v. Anderson, 269 U.S. 422 46 S. Ct. 131, 134, 70 L.Ed. 347. There, speaking of the purpose of comparable provisions of the earlier revenue code, the court said that such purpose, 269 U.S. 440, 46 S.Ct. 134: "Was to enable taxpayers to keep their books and make their returns according to scientific accounting principles, by charging against income earned during the taxable period, the expenses incurred in and properly attributable to the process of earning income during that period". Accordingly, in that case, the taxpayer was required to deduct from its gross income for the year 1916 certain expenses attributable to the production of that income during the year notwithstanding the items (munitions tax) were not paid or payable until 1917. The same rule was followed in Harrold v. Commission-

er, 4 Cir., 192 F.2d 1002, in which the taxpayer, engaged in strip mining operations which required it to back fill the lands mined, was permitted to deduct from its gross income in 1945, the cost of back filling a tract of land completely stripped in 1945, notwithstanding the refilling did not occur until 1946. The cost of the restoration work could be estimated with reasonable accuracy. The court distinguished the cases disallowing such deductions where the cost could not easily be arrived at.[9]

We think also that petitioner correctly treated the brokerage fees relating to the goods billed on the December 31 dates as deductible expenses in those years. The Tax Court disapproved this procedure on the ground that it thought there was a failure to introduce evidence of the contracts with the brokers to show that there was any fixed liability for the brokerage fees prior to the payment of the purchase price for the goods. The evidence, however, showed that the brokers doing business with the industry contracted in accordance with the established trade practice of considering that title to the unshipped goods passed on the billing dates, and that the brokerage fees accrued to the broker on those dates. In our view the finding that there was want of proof on this point is clearly erroneous.

In 1944 petitioner sold fruit products to the United States Government. There is no dispute but that the title thereto passed to the United States in 1944. However, the Tax Court approved the action of the Commissioner in disallowing the accrual on petitioner's books in the year 1944 of the estimated

---

that none of such goods were pledged or otherwise hypothecated at the dates of billing. Other goods were billed to other buyers on open accounts. Some of those goods were pledged to a Sacramento bank when billed, but were in each case released from the pledge prior to shipment to the buyer. We find nothing in these facts which would operate to prevent passage of title on the billing dates.

9. The Court said, 192 F.2d at page 1004: "Moreover, decisions of the courts, in-

cluding the Tax Court itself, furnish examples of the allowance of a reasonably accurate estimate of the cost of meeting a liability as a proper deduction from income of a taxpayer on the accrual basis, even when the work is not done and the precise cost is, therefore, not ascertainable until after the expiration of the fiscal year." The rule in that case was approved in Central Cuba Sugar Co. v. Commissioner, 2 Cir., 198 F.2d 214, 218.

expenses of crating the canned goods sold to the Government. This crating occurred in 1945. For the same reasons previously indicated we hold that this 1944 deduction was proper.

Finally, we are of the view that the petitioner's method of accounting clearly and accurately reflected its income wholly apart from the question whether title to the goods did or did not pass to the buyers on the dates of billing. Upon this aspect we are agreed with what the six dissenting judges said in this case.[10]

Not only do we have here a system of accounting which for years has been adopted and carried into effect by substantially all members of a large industry, but the system is one which appeals to us as so much in line with plain common sense that we are at a loss to understand what could have prompted the Commissioner to disapprove it. Contrary to his suggestion that petitioner's method did not reflect its true income it seems to us that the alterations demanded by the Commissioner would wholly distort that income. It is reasonable that both the taxpayer and the Government should be able accurately to ascertain the income accruing to the taxpayer on account of each annual pack. The Commissioner would break up the petitioner's product for the year 1940 and throw the receipts from the portion shipped before December 31 into gross income for that year and the receipts from the unshipped portion into the following year. If in a succeeding year there arose a market shortage which led to a demand which brought about almost complete shipment of the pack before December 31, the Commissioner's accounts for that succeeding year would cover one nearly complete pack and portions of the income and deductions relating to the preceding pack. We see no reason for any such requirement on the part of the Commissioner.

The judgment of the Tax Court is reversed and the cause is remanded with directions to modify the judgment in accordance with this opinion.

10. "Opper, J. dissenting: The practice of disapproving consistent accounting systems of long standing seems to me to be exceeding all reasonable bounds. See Heer-Andres Investment Co., 17 T.C. 786. Methods of keeping records do not spring in glittering perfection from some unchangeable natural law but are devised to aid business men in maintaining sometimes intricate accounts. If reasonably adapted to that use they should not be condemned for some abstruse legal reason, but only when they fail to reflect income. There is no persuasive indication that such a condition exists here. On the contrary, a whole industry apparently has adopted the method used by petitioner.

"It will not do to say that respondent should not have disturbed petitioner's accounting method, but that since he has done so, we are powerless to do otherwise. As long as we continue to approve the imposition of theoretical criteria in so purely practical a field, respondent will go on attempting to seize on such recurring fortuitous occasions to increase the revenue, even though he may actually accomplish the opposite. Cf. Heer-Andres Investment Co., supra; Robert G. Frame, 16 T.C. 600. I think it evident that petitioner's generally recognized accounting system did not distort its income and that it should be permitted to continue to use it. Cf. Atlantic Coast Line R. R. Co., 4 T.C. 140. Van Fossan, Murdock, Leech, Johnson and Tietjens, JJ., agree with this dissent."