William S. GILLIS, and Loretta L. Gillis, Appellants,

v.

UNITED STATES of America, Appellee.

UNITED STATES of America, Appellant,

v.

William S. GILLIS, and Loretta L. Gillis, Appellees.

No. 25207.

United States Court of Appeals Fifth Circuit.

Oct. 15, 1968.

Albert E. Coneway, Harlingen, Tex., for appellants.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Atty., Tax Div., Harry Baum, Robert I. Waxman, Attys., Dept. of Justice, Washington, D. C., Morton L. Susman, U. S. Atty., James R. Gough, Asst. U. S. Atty., Houston, Tex., for the United States.

Before GOLDBERG and CLAYTON*, Circuit Judges, and HANNAY, District Judge.

GOLDBERG, Circuit Judge:

This suit for the refund of federal income taxes plus interest for the calendar years 1957 and 1958 presents two separate issues involving Internal Revenue Service objections to items returned as accruals by a partnership. The first issue concerns objections to the partnership's taking as an accrued liability the estimated future sales losses in fulfilling its contractual obligations to export cotton under the regulations of the Commodity Credit Corporation. The second issue involves the question of whether the partnership was entitled to accrue and deduct in its 1958 fiscal year the damage claims asserted against it by a foreign corporation under the arbitration procedures established to settle claims resulting from exporting and importing cotton on the world market.

The appellant William S. Gillis was a partner with Vernon M. Murphy in the Murphy Cotton Company operating out of Harlingen, Texas. Gillis owned 25 per cent of the partnership, and Murphy owned 75 per cent. The partnership engaged in buying and selling cotton in the domestic and foreign markets. The partnership kept its books by the accrual method based on a fiscal year from February 1 to January 31. Under the Internal Revenue Code and Regulations, the income received from the business

for the fiscal year January 31, 1957, was reported in the partners' personal income tax for the calendar year 1957; the same procedure was followed in regard to the income tax returns for 1958. The taxpayers filed their personal income tax returns on a calendar year basis. The Internal Revenue Service questioned certain deductions which the partnership had listed as accrued liabilities. These challenges led to changes in the personal income tax returns of the appellants and an increase in the amount due for the 1957 and 1958 tax years. The taxes as recomputed were paid and a claim for refund was denied.

## I.

### LOSSES FROM SALES ATTRIBUTED TO CCC TRANSACTIONS

In 1956, the Commodity Credit Corporation (CCC) conducted a cotton export program designed to reduce its stockpile of domestic cotton. This program was in effect for the years in question. The program provided for contracts between the CCC and the domestic cotton merchants under which the CCC sold its cotton to the merchant at the lower foreign price for cotton. In order to obtain this discount from the higher domestic price the cotton merchant had to agree to (1) sell and export the cotton in a foreign sale or (2) acquire a like amount of cotton on the domestic market and export that cotton. The merchant further had to agree that both the original purchase of cotton from the CCC and the subsequent sale in a foreign market of the same cotton or a like amount purchased on the domestic exchange would be consummated within the fiscal period established by the CCC from August 1 to July 31 of the following year. Under CCC regulations the domestic cotton merchant was required to make a deposit of cash, bond, or other acceptable collateral to guarantee his performance in exporting the required amount of cotton. The deposit

---

* Judge Clayton, the third judge constituting the Court, participated in the hearing and the decision of this case. The present opinion is rendered by a quorum of the Court pursuant to 28 U.S.C.A. § 46, Judge Clayton having taken no part in the final draft of this opinion.

was established by determining the difference between the domestic and foreign prices. In 1957, the amount of deposit required was $30 per bale, and in 1958, the required deposit was $37.50 a bale. In addition to forfeiting the bond, if the cotton merchant failed to export the same amount of cotton as had been purchased from the CCC within the fiscal year, he would be liable for an additional amount. This additional obligation was determined by (a) the amount by which the sum originally paid CCC was exceeded by the domestic market price of such cotton or (b) 105 per cent of the current export price plus reasonable carrying charges, whichever was larger.

The CCC further provided for a "three-way agreement" by which one merchant could sell his right to buy cotton from the CCC at the lower foreign price. The "selling" merchant would sell his "rights" to the "buying" merchant at the amount per bale of the then difference in price between the foreign and domestic prices. The "selling" merchant would then be obligated to acquire a like amount of cotton from the domestic market and export it within the fiscal year. As a hedge against inflation most cotton merchants, including the taxpayer, would within a few days (usually not more than three) enter into contracts to purchase domestic cotton for future delivery to comply with their obligation to export a like amount of cotton before the CCC deadline. The merchant was further required to deposit a bond to insure the performance of this contractual obligation. Thus, shortly after the agreement between the CCC and the cotton merchant was sealed and the "rights" sold in the domestic market, the amount of the loss which would be incurred when the merchant sold cotton in the international market pursuant to his agreement with the CCC was fixed.

Under these arrangements, the cotton merchant broke even by purchasing CCC cotton at the lower foreign price and selling it locally at the higher domestic price, and then buying domestic cotton at the higher local price and selling it at the lower foreign price. The gross profit realized by the merchant was the customary $2.50 per bale handling charge from which the merchant usually realized a net profit of $1 per bale.

The issue at bar arises because the partnership made its profit sale in the domestic market under three-way contract arrangements during the fiscal year ending on January 31, but the loss sales in the foreign market required under the export provisions of the CCC contract did not occur until the partnership's following fiscal year, since the CCC allowed the partnership until the following July 31 to comply with its export requirements.

The specific facts are as follows. During the fiscal year from February 1, 1956, to January 31, 1957, the partnership purchased 700 bales of cotton from the CCC at approximately $30 per bale below the domestic price. This cotton was sold on the local market, and the cost and sale of this transaction was included in the partnership's income tax accounting for the fiscal year ending January 31, 1957. Following CCC regulations, the partnership at the time of the purchase deposited a bond with the CCC for $30 per bale for 700 bales, or $21,000, to insure that the partnership would export 700 bales of cotton. On the return for the fiscal year ending January 31, 1957, the partnership entered a liability of $21,000 as an accrued expense. Between February 1, 1957, and July 31, 1957, the partnership consummated the 700-bale foreign sale and export by purchasing cotton on the local market and exporting it. This resulted in a loss of approximately $30 per bale or $21,000. This amount was treated as a payment of the accrued liability as entered for the fiscal year ending January 31, 1957. During the fiscal year from February 1, 1957, to January 31, 1958, the partnership purchased 1,493 bales of cotton from the CCC at approximately $37.50 per bale below the domestic price. This cotton was sold on

the local market, and the cost and sale of this transaction was included in the partnership's income tax accounting for the fiscal year ending January 31, 1958. The partnership at the time of the purchase deposited á bond with the CCC for $30 per bale or $44,790. The partnership had not fulfilled its obligation to export 1,493 bales of cotton by the end of the fiscal year of January 31, 1958, since under CCC regulations it had until July 31, 1958, to meet this obligation. However, in the return for the fiscal year ending January 31, 1958, the partnership entered an accrued liability of $55,987 as an expense item against its income for this fiscal year or $37.50 for 1,493 bales. Between February 1, 1958, and July 31, 1958, the partnership consummated the 1,493-bale foreign sale and export by purchasing cotton on the local market and exporting it. This resulted in a loss of approximately $37.50 per bale or $55,987. This amount was treated as a payment of the accrued liability as entered for the fiscal year ending January 31, 1958.

The IRS contends that the loss resulting from the exporting sales following the partnership's fiscal years ending in 1957 and 1958 should not be allowed as accrued expenses for the fiscal years listed in the partnership's returns. The district court held that the partnership was correct in listing the losses resulting from the export sales in the year in which the obligation to the CCC was made to export such cotton and that the government's contention that such losses should be listed in the year that the sale was made was incorrect.

We begin our analysis with an examination of the relevant provisions of the Internal Revenue Code and Regulations. Section 461 of the 1954 Code, 26 U.S.C. § 461, which sets forth the general rule for determining the proper year for taking a deduction, provides as follows:

"(a) *General Rule.* The amount of any deduction or credit allowed by this Subtitle shall be taken for the taxable year which is the proper taxable

year under the method of accounting used in computing taxable income." The applicable Treasury regulation provides as follows:

"§ 1.461–1. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION.

(a) General Rule. * * *

(2) *Taxpayer using an accrual method.* Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. However, any expenditure which results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year may not be deductible, or may be deductible only in part, for the taxable year in which incurred. While no accrual shall be made in any case in which all the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy. * * * * "

From the Code and Regulations we are able to discern that there are two general principles at work here and that these principles need not conflict. The first is that the net income of the taxpayer must be computed and taxed on an annual basis so as to provide revenue to the government at regular intervals. The second principle is that the taxpayer should use a system of accounting that accurately reflects his annual income. In the case *sub judice* the taxpayer has used such a system. There is no doubt that neither the income nor expense from a business transaction may be accelerated or postponed from one year to another in order to reflect the ultimate result of such transaction. This principle must be observed even though the postponement or acceleration of the

results of a transaction might appear to be a more equitable solution for the government or the taxpayer. Consistency here is not a hobgoblin but a realistic economic imperative. See Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725 (1933); Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1930); Schuessler v. Commissioner, 230 F.2d 722 (5 Cir. 1956).

■ The theory behind the accrual system is not complicated. Income items are reported in the year in which the right to receive them becomes fixed even though such items are not immediately receivable. At no time, however, are such items reportable later than the year of actual receipt. So it is with deductions. Items to be deducted are reported in the year in which they are incurred, that is, the year in which the liability to pay such items becomes fixed and the amount is reasonably ascertainable even though the payment is not then due. See Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 (1944); Brown v. Helvering, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725 (1933); United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926). For this reason it is recognized that an item should be accrued "when (1) all the events have occurred which fix the amount of the claim and determine the question of liability; (2) the amount is readily ascertainable; and (3) the liability therefor is determined rather than contingent." 2 Mertens, Law of Federal Income Taxation § 12.76 at p. 306. Thus the dispute in this case is whether under these rather clear general principles the partnership should be allowed to deduct as accrued expenses the loss sales which the taxpayer had to make in order to fulfill its agreement with the CCC, which amounts were fixed within the taxable years in question.

In support of its contention that such loss sales should not be accrued as expenses in those years, the IRS alleges such losses were not sustained in the taxable years claimed by the partnership and that the losses when accrued were not definite and certain but were contingent. Such contentions are without merit.

In Schuessler v. Commissioner of Internal Revenue, 230 F.2d 722 (5 Cir. 1956), the taxpayer had sold furnaces and with each sale he had executed a contract to service the furnaces for a 5-year period. The cost of servicing the furnaces was included in the sale price and the taxpayer reported the sale price as income in the year of the sale and also listed as an accrued expense the cost of the services. The Fifth Circuit in upholding the accrual of these expenses said:

"We think it quite clear that petitioner's method of accounting comes much closer to giving a correct picture of his income than would a system in which he sold equipment in one year and received an inflated price because he obligated himself, in effect, to refund part of it in services later but was required to report the total receipts as income on the high level of the sales year and take deductions on the low level of the service years.

\* \* \*

"We find not only does it not offend any statutory requirement, but, in fact, we think it is in accord with the language and intent of the law. Clearly what is sought by this statute is an accounting method that most accurately reflects the taxpayer's income on an annual accounting basis."

230 F.2d at 723–724.[1]

This position is not novel and is well supported by prior case law. In Pacific Grape Products Co. v. Commissioner of Internal Revenue, 219 F.2d 862 (9 Cir. 1955), the taxpayer was a canner of fruit and fruit products. The company

1. We realize that the *Schuessler* case dealt with § 43 of the 1939 Code and that subsequent legislative developments may have cast doubt upon the validity of the precise holding, but such developments have no effect upon the continuing validity of the above quoted general principles.

had listed as accrued items the income from sales and the expenses that would be incurred in the estimated cost of labeling and preparing the goods for shipment as well as brokerage fees that would be incurred in the following year. The tax court disallowed the accrued expenses, and in reversing the tax court, the Court of Appeals said:

"Not only do we have here a system of accounting which for years has been adopted and carried into effect by substantially all members of a large industry, but the system is one which appeals to us as so much in line with plain common sense that we are at a loss to understand what could have prompted the Commissioner to disapprove it. Contrary to his suggestion that petitioner's method did not reflect its true income it seems to us that the alterations demanded by the Commissioner would wholly distort the income."

219 F.2d at 869.

In Harrold v. Commissioner of Internal Revenue, 192 F.2d 1002 (4 Cir. 1951), the taxpayer was allowed to deduct as an accrued item the cost of back-filling land following the company's strip mining operation where the back-filling was required by state law. The court stated:

"We conclude that when all the facts have occurred which determine that the taxpayer has incurred a liability in the tax year, and neither the fact nor the amount of the liability is contested, and the amount, although not definitely ascertained, is susceptible of estimate with reasonable accuracy in the tax year, deduction thereof from income may be taken by a taxpayer on an accrual basis. This procedure does not violate the principle that income taxes must be calculated on an annual basis but, on the contrary, allocates to each year the proper income and expense, and prevents distortion of the taxpayer's financial condition in the tax year. See United States v. Anderson, 269 U.S. 422, 440, 46 S.Ct. 131, 70 L.Ed. 347. It gives heed to the true facts of each case rather than to an arbitrary rule of thumb; and the adjustments which must be made after the precise amount is ascertained are as easily consummated as those which are required when it is impracticable to make precise calculations of income or outgo before the end of the year, although all of the events which fix the amount have accrued therein. We think the proper approach to the problem before us should be realistic and one that accords with good business practice, rather than an approach based upon subtle technicalities."

192 F.2d at 1006.

In some cases, all that has been required is that the taxpayer be able to reasonably *estimate* the deduction, and the courts have not required that this estimate be made with "mathematical precision." See e. g., Denise Coal Co. v. Commissioner of Internal Revenue, 271 F.2d 930, 936 (3 Cir. 1959). In the case at hand, the partnership knew the amount of the deduction from the bond requirement established by the CCC. If the export sales were not made, the partnership would lose its bond plus other penalties. Under these circumstances, the amount of the deduction in question is established with reasonable certainty.

■ These cases amply illustrate that the partnership was following recognized accounting procedure when it deducted as expense the loss from the export sales. From the record, it is apparent that the partnership was entitled to deduct as liabilities $21,000 for the fiscal year ending January 31, 1957, and $55,987.50 for the fiscal year ending January 31, 1958, since these amounts represented CCC export obligations incurred within the fiscal years 1957 and 1958, respectively. The partnership contracted with CCC during its fiscal years to purchase cotton, and this purchase carried with it the obligation to export a like amount of cotton. The partnership was required to post a bond to insure its

fulfillment of this obligation, and the time in which the obligation was to be fulfilled was set within a six-month period following the end of the fiscal year. There is no way this export obligation could be viewed as being contingent. The transactions in question were designed to be offsetting transactions. The contractual promise to export cotton was as definite as the purchase of cotton from the CCC at below the domestic price. All of the events which determine the nature and the amount of the obligations were definite.

We therefore affirm the district court's judgment in favor of the taxpayer on this issue.

## II.

## CLAIMS UNDER ARBITRATION

The second issue arises from the fact that the partnership accrued as an expense for its fiscal year ending February 1, 1958, claims made by a foreign corporation relating to export sales consummated during that fiscal year, which claims were subject to an established arbitration procedure.

During the fiscal year ending January 31, 1958, the partnership, by eight written contracts, sold 6,523 bales of Texas cotton to a Polish company, Centrala Importowa Przemeplu Wlokunnlezeto Textilimport. All of the contracts were signed, all the cotton shipped and all the payments were received by the partnership within the fiscal year ending January 31, 1958, although some 1,124 bales did not arrive in Poland until mid-February, 1958. Textilimport made payments for the cotton to the partnership when the cotton was shipped from the United States by multiplying the weight in pounds of the cotton by the price per pound agreed on in the contracts. The contracts provided that if at the time Textilimport received the cotton it did not meet the specifications of the contracts, Textilimport would make claims against the partnership. Any dispute over the amount of the claims filed by Textilimport was to be settled through an arbitration arrangement provided for in the contract. This arbitration procedure was standard practice in the international cotton trade, and it was established practice to settle by arbitration any disputes arising from claims that the grade of cotton shipped by the exporter was of a lower grade than that specified for in the contract. Indeed, due to the indeterminable nature of the cotton business, the exporter may know at the time the cotton is shipped that it does not meet the specifications of his buyer. That was the case here. Due to heavy rains in the Abilene, Texas, area where the partnership purchased cotton to meet the contracts with Textilimport, the partnership knew at the time of the shipment to Poland that the cotton was inferior to that called for by the contract and that, consequently, claims would be made by Textilimport.

The partnership, in preparing its return for the fiscal year ending January 31, 1958, entered the gross amounts received from Textilimport as income and deducted in that return as an accrued liability the anticipated claims of Textilimport which the partnership had determined would be the difference in the price paid and the price of the cotton actually shipped. This claim was for $64,609.41. The difficulty arises because of the way the claims were handled by the partnership when they were presented by Textilimport. Twelve claims were made. Four of these were paid without arbitration or other action. The remaining eight claims were submitted to arbitration as provided for in the contracts with Textilimport, and two of the arbitration findings were appealed by the partnership. The eight claims as determined by such arbitration and appeal procedure were ultimately paid by the partnership.

The district court held that the claims filed by Textilimport were contingent and unascertainable and, therefore, they were not entitled to be deducted by the partnership in the fiscal year ending January 31, 1958.

The issue then is whether claims made pursuant to an export cotton contract

which provides for an arbitration procedure constitute a contingent liability that cannot be claimed under the accrual method of accounting for tax purposes.

■ The government contends that these claims were contingent, and that for this reason the deduction should not be allowed. The basis of this contention is that all of the events which determine liability did not occur within the fiscal year used by the partnership. The authority cited by the government does support the proposition that liability cannot be deducted as long as it is contingent; thus, where the taxpayer denies or disputes liability, the liability cannot be deducted under accrual principles. See United States v. Texas Mexican Railway Co., 263 F.2d 31 (5 Cir. 1959). In Dixie Pine Co. v. Commissioner, 320 U.S. 516, 64 S.Ct. 364, 88 L.Ed. 270 (1943), the Supreme Court held that an accrual basis taxpayer contesting liability in a state court could not accrue the expense until the liability was established and that this would not occur until the case was determined by the state court. The facts in *Dixie Pine* and the other cases cited by the government are materially distinguishable from the case at bar. The cases cited pertain to situations where the taxpayer was judicially contesting the question of liability or the amount of the liability.

The partnership in this case knew that it was liable to Textilimport, and under the practices of the trade, an arbitration procedure had been established to deal with claims of this nature in the international market. Arbitration in the international cotton trade is not as adversative as usual litigation. Claims are anticipated and are in the norm of the trade. These disputes do not have the sting attributed to conventional trials. We do not see anticipated claims regularly disposed of by arbitration as the handmaiden of contingency.

This arbitration procedure, which was specified and agreed upon in the contracts in question, is binding upon the parties and provides that there shall be no recourse to the courts by a dissatisfied party. Thus, this arbitration process has aspects of finality which justify a tax treatment different from more porous and less final procedures of determining liability.[2]

■ While it is well recognized that a deduction cannot be taken where the liability is contested, there is no requirement that where a claim is subject to an arbitration procedure established as a practice in the trade the taxpayer is precluded from deducting such claims as an accrued liability on the grounds that it is contingent. The determinative issues are, first, whether all the events have occurred which fix the amount of the liability and, second, whether a reasonable estimate can be made. See Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538 (1930); United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347 (1926). In the case at hand, the partnership through its experience in the cotton trade was able to estimate the claims that would be made against it to within one-half of one per cent. The fact that the partnership submitted some of the claims to arbitration resulting in a larger award to Textilimport does not render this estimate invalid. Even after the final award had been made and paid by the partnership, the original estimate was reasonably certain.[3] If the government required all

---

2. The international arbitration system specified and agreed upon in the contracts in question was that of the Gdynia Cotton Association in Poland for arbitration and the Le Havre agencies in Le Havre, France, for the appeal phase of such final price determination. The parties to the arbitration contract further agree that the arbitration procedure and appeal will make the final price determination and that such determination shall not be subject to litigation. Hence the parties are contractually bound to this specialized and "trade unique" system of price determination.

3. Estimated claims by the partnership were $64,609.41; Textilimport claims were for $64,307.33, and the final award after arbitration and appeal was $71,633.61.

taxpayers to estimate accrual expenses with such accuracy, very few could use this accounting method.

The government's contentions, if sustained, would penalize the partnership for using the arbitration procedure. This is unacceptable. The liability was acknowledged by the partnership, and a reasonable estimate was made as to its amount. Arbitration on the international cotton market is substantially different from court litigation and perhaps even from other arbitration arrangements. The submission of a claim to arbitration in international cotton transactions is not the same as contesting liability in a judicial proceeding, and we will not treat it as if it were.

We therefore hold that the district court erred in holding that the partnership was not entitled to deduct in its 1958 fiscal year breach of contract claims which were determined by arbitration.

Since all accruals in income taxation need not be calibrated to finite absolutes, the judgment of the district court is affirmed in part and reversed in part.