W.J. STRICKLAND COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
W. J. Strickland Co. v. Commissioner
Docket No. 7273-72.
United States Tax Court
T.C. Memo 1974-98; 1974 Tax Ct. Memo LEXIS 220; 33 T.C.M. (CCH) 484; T.C.M. (RIA) 74098; April 22, 1974, Filed Peter J. Troy and Paul L. Hanes, for the petitioner. Dudley W. Taylor, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies of $2,406.70 and $49,609.16 in petitioner's Federal income taxes for its fiscal years ending September 30, 1968, and September 30, 1969, respectively. The only issue remaining for decision is whether the estimated costs of repairing and replacing defective parts furnished by petitioner under a subcontract accrued under section 461(a)[1] as a deduction in petitioner's taxable year ending September 30, 1969. *221 FINDINGS OF FACT W.J. Strickland Company (hereinafter petitioner), a Georgia corporation, maintained its principal office in Marietta, Georgia, at the time its petition was filed. In reporting its income, petitioner used the accrual method of accounting and a fiscal year ending September 30. During the years in issue, petitioner operated a machine shop, manufacturing certain specilized machined parts. On November 22, 1968, it contracted with Lockheed-Georgia Company (hereinafter Lockheed) to manufacture and supply, as a subcontractor, a part for the C-141 aircraft designed and built by Lockheed. Paragraph 6 of the contract's General Terms and Conditions of Purchase contained a seller's warranty that the product would be free from defects. This warranty expressly ran to Lockheed and its customers. Under the terms of the contract, petitioner was to provide 606 trunnion fittings which constituted a part of the main landing gear retraction system of the C-141 aircraft. All of these fittings were delivered to Lockheed and were paid for prior to September 30, 1969. Lockheed incorporated two of these fittings in each TCTO kit sent to various Air Force bases for installation *222 on the C-141 aircraft. While installing the TCTO kits on its C-141's, McChord Air Force Base (McChord) found a kit with bad chrome plating on one fitting assembly. Subsequent inspection of 22 fittings in 11 kits revealed that 20 fittings were defective in that the chrome-plated bearing races were corroded and pitted. In a discrepancy report dated October 1, 1969, [2] McChord informed the Quality Control Division, Ogden Air Materiel Area (Ogden), of this defect. McChord also sent a copy of the discrepancy report to Military Airlift Command which requested, on October 3, 1969, that other bases check their TCTO kits. A check of kits at other Air Force bases resulted in similar discrepancy reports from Norton AFB (dated October 3, 1969), Altus AFB (dated October 6, 1969), and Charleston AFB (dated October 7, 1969). On October 4, 1969, Military Airlift Command ordered that installation of these kits be halted and directed Ogden to take the necessary action to alleviate *223 the problem. Subsequent inquiry disclosed that the defective trunnion fittings had been packed in the TCTO kits by Lockheed. On October 6, 1969, Ogden forwarded the McChord discrepancy report to Jim Beasley, Air Force Plant Representative at Lockheed. The first formal record of Lockheed's knowledge of the defects is a memorandum dated October 7, 1969, from R. V. Williams, the Lockheed C-141 Program Manager, to M. L. Turner, Customer Service. This document notes in detail the timing and sequence of events as set forth above; there is nothing in the memorandum to indicate that Lockheed was orally informed of these defects or that it learned of the defects before October 1, 1969. On October 8, 1969, J. W. Mobley, the Lockheed Quality Control Representative assigned to petitioner, returned from out of town and was informed of the defective fittings. He thereupon called W. J. Strickland (Strickland), petitioner's president, who was "shocked" by the news. By a letter dated October 23, 1969, Lockheed notified the several Air Force bases initiating the discrepancy reports on the trunnion fittings that it was continuing its investigation and that a final reply would be forthcoming *224 on or before November 28, 1969. W. D. Jascomb, Lockheed Warranty Claims Coordinator for the C-141, reported the nature of the trunnion fittings defect and the results of a subsequent laboratory report to the members of the Lockheed Warranty Committee in an interdepartmental communication dated October 30, 1969. He recommended that all kits and fittings not presently installed in aircraft be returned for inspection and rework and that fittings presently installed should remain installed until sufficient parts had been reworked to support a swapout program. In a warranty directive dated November 11, 1969, Lockheed's Warranty Committee classified the fittings produced by petitioner as "a deficiency," determined that the fittings were within the warranty period, and that correction of the defect should be handled by a turn-around rework program. The minutes of this meeting noted that the Engineering Department felt that the fittings were reworkable and structurally adequate in their present deficient state. It also noted that a vendor claim against petitioner should be considered. In a communication dated November 14, 1969, Lockheed notified the Air Force that all kits and fittings *225 not presently installed in aircraft should be returned to Lockheed for inspection and rework and that fittings presently installed in aircraft should not be returned until sufficient parts had been reworked to support a turn-around program. In a letter dated December 8, 1969, Strickland notified petitioner's accountant that the fittings had been rejected by Lockheed for various discrepancies and estimated that the rework or replacement schedule was such that petitioner could expect to replace all these parts at a cost of $60,000. On December 15, 1969, petitioner filed its Federal income tax return for the taxable year ending September 30, 1969. On that return, petitioner deducted $60,000 for a reserve in that amount, representing the estimated cost of reworking the rejected trunnion fittings. Initially, the discrepancy was thought to be due to substandard machining and plating. However, after the rework program began, surface cracks were discovered in the forgings under the chrome plating. The rework instructions originally developed by Lockheed were not sufficient to permit rework of the cracked fittings. Lockheed therefore called a meeting on January 15, 1970, in order to *226 develop additional rework instructions. As of April 19, 1971, petitioner had reworked 495 fittings, which had been sent back to Lockheed, and had 22 fittings in process, which were to be delivered by mid-June 1971. As of April 30, 1971, petitioner had incurred expenses of $45,255.68 in reworking the trunnion fittings, leaving a reserve balance of $14,744.32. Lockheed determined that, due to the long period over which the defective fittings were being returned to petitioner for reworking, it would be unfair to petitioner to extend the rework schedule. Accordingly, the Air Force agreed that any parts not returned by July 31, 1971, would not be accepted by Lockheed or petitioner for reworking. In his statutory notice dated July 20, 1972, respondent disallowed the $60,000 deducted as the estimated cost of reworking the defective parts on the 1969 return on the ground that "not all events determining the fact of the liability and the amount thereof had occurred" by the end of that taxable year. It further determined that the deduction was properly accruable in petitioner's taxable year ending September 30, 1970. OPINION The parties agree that the legal principles controlling *227 the timing of a deduction by an accrual basis taxpayer are found in section 461(a)[3] and section 1.461-1(a) (2), Income Tax Regs.[4] Petitioner contends that all the events sufficient to fix the fact and amount of its liability for replacing the defective fittings had occurred prior to the close of its fiscal year on September 30, 1969. Respondent argues that the deduction is not proper since these events had not occurred by the end of that taxable year. The issue is a factual one to be determined on the basis of the record as a whole. Petitioner *228 has the burden of proving that accrual occurred in the taxable year, Brown v. Helvering, 291 U.S. 193, 199 (1934), and respondent's determination is prima facie correct. See Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142, Tax Court Rules of Practice and Procedure.
Based upon a careful study of the record as a whole, we find that petitioner is not entitled to the deduction claimed since, at the close of its fiscal year 1969, it did not have information that the trunnion fittings were defective and would be returned for reworking at its sole expense, or information as to the cost of the corrective action. The only event which the record discloses as having occurred within the taxable year ending September 30, 1969, was the discovery on that day of the defective trunnion fittings at McChord AFB. Petitioner's president, Strickland, testified that he had been orally informed of the defective fittings in late September 1969 by Jack Wilkie, a Technical Inspector at Lockheed. However, Wilkie failed to corroborate this testimony when he took the stand. Strickland's testimony on this point was vague; he could not recall the exact date in September when *229 he learned the fittings were defective and was evasive when asked how he could be sure he received such information prior to the close of the fiscal year. Strickland attempted to reconcile his testimony with the date on the first discrepancy report describing the defect (October 1, 1969) by claiming that Lockheed Quality Control maintained oral communication with its field representatives at various Air Force bases. However, petitioner made no showing that this network for oral consultations resulted in its being informed of either the defect or its extent or the cost of the corrective action prior to September 30, 1969. The tangible evidence indicates that petitioner did not learn of the defect until early October 1969. The first discrepancy report was dated October 1, 1969; Military Airlift Command did not decide to halt installation of the TCTO kits until October 4, 1969; and Lockheed's first memorandum of the defect is dated October 7, 1969. Moreover, J. W. Mobley, Lockheed's Quality Control Representative assigned to petitioner, called on Strickland on October 8, 1969, to inform him of the defect. Even assuming petitioner learned of the defect prior to the end of its *230 1969 fiscal year, a deduction in that year is still not allowable for two reasons. First, the amount of petitioner's liability was not fixed on September 30, 1969, since Strickland testified that Wilkie told him he did not know how serious or widespread the defect was. Second, petitioner's liability was not clear. Strickland testified that he told someone at Lockheed that petitioner was not responsible for the defect and accrual does not occur as long as a liability is being contested. See 1 nited States v. Consolidated Edison Co., 366 U.S. 380, 384 (1961). [5] Not until November 11, 1969, did Lockheed's Warranty Committee determine that the part was defective, that claim had been made within the warranty period, and that a turn-around program should be started. Based upon these facts, we find that the "all events" test had not been satisfied by the end of petitioner's 1969 taxable year. We think Gillis v. United States, 402 F.2d 501 *231 (C.A. 5, 1968), cited by petitioner, is clearly distinguishable on its facts. In that case, the taxpayer knew, at the time its cotton was shipped, that the cotton was substandard, thus creating liability under the contract, and the extent of the liability could be determined with reasonable accuracy. Here Strickland testified that he was "shocked" when he learned of the defect in the trunnions which petitioner had manufactured, and Wilkie did not know the extent of the defect before the close of the taxable year. Petitioner argues on brief that it was entitled to a deduction for a reserve to the extent of its possible liability under the contract with Lockheed. We have held in similar cases that such reserves are not deductible even when, in the taxable year, liability is clear (not the situation here) if the amount of the expense is not reasonably ascertainable on the basis of past experience. Portland Copper & Tank Works, Inc., 43 T.C. 182, 188-189 (1964), affirmed per curiam 351 F.2d 460 (C.A. 1, 1965) (reserve for price adjustment under renegotiable contract); Juniata Farmers Cooperative Association, 43 T.C. 836, 841 (1965), acq. 1966-1 C.B. 2 *232 (reserve for spoilage of stored grain); Bell Electric Co., 45 T.C. 158, 166 (1965), acq. 1966-2 C.B. 4 (reserve for warranty service). Petitioner's liabilities were contingent in the taxable year in that all the events necessary to create those liabilities and to fix the amount thereof had not occurred within the taxable year. Brown v. Helvering, 291 U.S. at 200. Harrold v. Commissioner, 192 F.2d 1002 (C.A. 4, 1951), cited by petitioner, in which a reserve for the cost of backfilling land, required by state law, was allowed, is also clearly distinguishable on its facts. There the obligation to backfill the mined properties was contractually and statutorily fixed within the taxable year, and long experience in backfilling land enabled the taxpayer to estimate the costs with reasonable accuracy. Here, neither the fact not the extent of the liability to make the repairs had been established within the taxable year, and petitioner had no previous experience to guide it in estimating the reapir costs as a basis for establishing reserves. Cf. American Automobile Assn. v. United States, 367 U.S. 687 (1961). In the alternative, *233 petitioner contends that it is entitled to consider events which occurred between the end of the taxable year on September 30, 1969, and the date on which the return for that year was filed. We find no merit in this contention. It is axiomatic that each taxable year is to be treated as a separate unit with income and expenses determined on the basis of facts known at the end of the taxable year. The practical necessity for determining taxable income on the basis of fixed accounting periods rather than on a transactional basis was clearly enunciated in Burnet v. Sanford & Brooks Co., 282 U.S. 359, 365 (1931).See also United States v. Consolidated Edison Co., 366 U.S. at 384-385. Further, section 1.461-1(a) (2), Income Tax Regs., expressly states that an accrual basis taxpayer may deduct an expense in the year "in which all the events have occurred" (emphasis added) to fix liability and the amount thereof with reasonable accuracy. For these reasons we hold that petitioner cannot base its claim for a deduction on events which occurred after the close of its fiscal year on September 30, 1969. To reflect the concessions of the parties herein, Decision will *234 be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. ↩
2. A copy of this report shows a typewritten date of "29 Sep. 69" which has been crossed out and replaced by a handwritten "1 Oct." However, the parties have stipulated that this report is dated October 1, 1969. ↩
3. SEC. 461. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION. (a) General Rule. - The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income. ↩
4. Sec. 1.461-1 General rule for taxable year of deduction. (a) General rule - * * * (2) Taxpayer using an accrual method. Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * ↩
5. Although Strickland testified that he did not consider "denying responsibility," he also testified (Tr. 36): Q. Did you ever indicate to any Lockheed official that you felt that the responsibility was not yours? A. Yes, sir. ↩