John W. LAMB, Plaintiff In Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12260.

Criminal Court of Appeals of Oklahoma.

Feb. 8, 1956.

James W. Batchelor, Durant, Paul R. Haunstein, Enid, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

John W. Lamb, plaintiff in error, hereinafter referred to as defendant, was charged jointly with his wife Martha Lamb, by information filed in the county court of Garfield County with the offense of the wilful failure to furnish necessary food, clothing, shelter and medical attendance for their four minor children. A trial by jury was waived, and the case was tried before the court, who rendered judgment finding both defendants guilty, as charged in the information, and fixed the punishment of each at a fine of $500 and to serve a term of six months confinement in the county jail. The defendant John W. Lamb has appealed from said judgment and sentence to this court. Martha Lamb has not appealed.

We shall treat but one specification of error advanced, to-wit: the sufficiency of the evidence to support the charge, as that will dispose of the case. There is much merit in two other specifications, but so far as this defendant is concerned no useful purpose would be served in treatment.

The prosecution was based upon an alleged violation of 21 O.S.1951 § 852, which provides:

"Every parent of any child who wilfully omits, without lawful excuse, to perform any duty imposed upon him by law to furnish necessary food, clothing, shelter or medical attendance for such child is guilty of a misdemeanor."

The evidence developed that the defendant, John Lamb, was a staff sergeant stationed at the Vanice Airforce Base at Enid:

that he was 26 years of age. and his home had been Idabel, Oklahoma; while his wife Martha was from Okmulgee, and was 22 years of age; that defendant had married his wife when she was 16 years of age, and within a period of six years they had four children, John Lamb age 4½ years, Larry Lamb age 3, Kathleen Lamb age 16 months, and Tommy Lamb age four months.

Defendant at the time in question had his family located at 414 West Chestnut Street, Enid, in a one and a half story frame house, with shade trees on the grounds. There were two bed rooms upstairs, a living room, kitchen, bath room and back porch down stairs. The rental paid was $50 per month. The home was adequate for the family.

We have examined the casemade to determine whether or not the evidence of the State, or as a whole, was sufficient to show that the defendant wilfully omitted to furnish necessary food, clothing, shelter or medical attendance for one or all of the children.

The more than 400 pages of evidence will not be summarized in detail, but pertinent points will be set out. Portions of the evidence concerning the wife's actions and conduct must of necessity be considered in determining the sufficiency of the evidence against the appealing defendant.

The record discloses that on May 3, 1955, the county attorney of Garfield County accompanied by a deputy sheriff and a policewoman of the Enid police department went to the defendant's home to make an investigation with reference to the care and welfare of defendant's minor children. They were not acting under a written order of the county court to bring the children before the court for examination, but apparently made the visit for the limited purpose of questioning the parents and perhaps viewing the children, if permission was granted. However, on reaching defendant's home they found the parents absent, and the children in care of a baby-sitter, an 18-year old girl by the name of Lois Jean Hutton, who permitted them to enter the home. The girl was questioned;

the two little boys were playing in the yard; they had on boxer shorts and were dirty; Mrs. Dozier, the policewoman said that their stomachs appeared to be bloated; the little girl, Cathy, was in the kitchen eating beans from a cup given her by the baby-sitter; according to Mrs. Dozier she appeared weak and had a breaking out; the four-months old baby boy was said to be upstairs; the officials proceeded, though shown not to have a search warrant, to search the whole house. The baby was found upstairs in a crib with a bottle of homogenized milk, which he was not taking at the time. There was an empty bottle. His diaper was wet, there was evidence of diaper rash and his privates had not been properly cared for. There was a bad body odor. The child was described as skin and bones and definitely appeared to be undernourished. There was a television set in the living room; there was an electric refrigerator and a new-looking washing machine; there were dirty clothes on the back porch; there was a bad odor in the house, there were dirty dishes and Mrs. Lamb's clothing was draped over a chair in the living room. The officers found a half gallon milk bottle about half full of milk. They did not find any other substantial amounts of food in the places searched, but there was no evidence that the ice freezing compartment of the refrigerator was examined or that every food storage place was looked into. Mrs. Dozier admitted on cross-examination that there could have been eggs there that she did not see. However, there were no eggs or bacon or bread discovered by the others in the party.

A short time after the county attorney and his party reached the Lamb residence, a second deputy sheriff arrived, and soon Mrs. Johnson, the juvenile officer, came, and then a newspaper photographer arrived. Some pictures were taken of the children, the dirty clothes around the washer, the pantry, and the house, and later at the hospital separate pictures were made of the four-months old infant, Tommy. Mrs. Johnson said the scalps of the children were dirty. She took the two boys to a boarding home while Mrs. Dozier took

Cathy and the baby to Dr. Robert Shuttee, a baby specialist, for physicial examinations.

As to the little girl, Cathy, Dr. Shuttee testified: "I felt that her health status was fairly good from a nutritional standpoint. She had one or two small lesions behind her ear that are not uncommon, an eczema type condition, but nutritionally, I thought that the little girl was all right." He stated that she showed no signs of hunger.

As to the baby, Tommy, the doctor testified that the examination definitely showed evidence of malnutrition that had extended over a month or more. He had the baby hospitalized. Witness further said:

"In an infant such as that, when they have had malnutrition over a period of time, and as I have said before, I felt like it had to be some time when it gradually lost weight or failed to gain, you must be quite cautious in starting any feedings to them in any degree. Otherwise, you don't just start putting a lot of food in them or you will cause a definite stomach and intestinal upset, so it has to be a gradual increase in their caloric requirement, which we did with this child and gradually introduced solid foods, and, of course, he was on a rather high vitamin and iron supplement."

The county attorney asked:

"Doctor, a child of that age in physical condition would store-bought-en homogenized milk be the proper type of food for that child? A. I wouldn't say that it wouldn't be, no, I can't say what conditions were in the child before he was brought to me, but once in a while we do recommend homogenized milk for that age youngster."

Witness further stated that the baby was underweight. On May 3 it weighed a few ounces over nine pounds, but at trial and in seven days it had gained one pound and fourteen ounces. He said that two or three days after the baby was placed in the hospital he broke out with the three-day measles, and that a 14 to 21 day incubation period precedes the visible appearance of measles.

On cross-examination as to Cathy he said that she definitely showed no indications of ringworm when he examined her on May 3, 1955. As to the baby, counsel stated that if it should develop that the baby was placed on a baby formula of Pet milk and Karo syrup by the doctor at the Field Base Hospital but had vomited constantly in taking that formula and it was recommended that he be placed on homogenized milk, "would you say that that would be improper medical treatment? A. No, sir."

Concerning the malnourished baby, the court asked Dr. Shuttee:

"And in your opinion, did it look like a child that had been neglected so far as his health was concerned, in your opinion exactly what you saw when you looked at the child, you formed an opinion? A. I felt like he needed more food, certainly, but whether he was neglected or whether he had not been taken to a doctor because of a bowel or digestive disturbance, I don't know that, all I know was that he was malnourished.

"Q. He was not a normal, healthy four-months old child? A. That's right."

Witness further stated:

"A. No, I wouldn't say it [the baby] had been neglected, I will say that the child was malnourished."

The court then asked the doctor if the baby had any skin trouble, any ringworms on it, and witness answered:

"No, that part was all right."

The court further asked:

"How did the child smell, did it appear like it had good care, from the standpoint of observation of the child—did it have on a clean diaper, had it been bathed? A. I believe, if I remember, that the baby did have some diaper rash, irritation around the penis scrotum, in and around the diaper area, but as far as actual dirty, I wouldn't say that, nor did I see any evidence of ringworm."

He further said that the diaper rash was not uncommon.

Mrs. Walter Farrell, a housewife and mother, testified to baby-sitting for the Lamb children at the request of Mrs. Lamb on Monday, May 2, 1955, a few minutes after 1 P.M.; that Mrs. Lamb left immediately after she arrived with some man in a car, but did not advise where she was going or how she could be reached, and gave no instructions concerning the children until witness asked for them; that Mrs. Lamb said the baby was to be fed homogenized milk every four hours and that the next feeding was due at 4 o'clock. The children were supposed to be asleep, and the baby sitter had never met them at the time Mrs. Lamb left in the car. The older children were to play inside the house when they awoke. Witness could not find any dry diapers; she said she could barely get the safety pins out of the baby's diaper and he appeared to have been wet all the morning. She found a dry pair of his father's shorts and used them for a diaper. She got some dry used diapers from the back porch and used on the baby and Cathy. She fed the children cake and milk, but found no meat. Witness further stated that the defendant, John Lamb, came home at 4 o'clock and seemed quite surprised and disturbed that Mrs. Lamb was not at home, and stated that he was supposed to have met her at 4 o'clock; that he went to a neighbor's to use a telephone and he paid her for baby-sitting and she left.

Mrs. Leon Nehring testified for the State and said that she first met Martha Lamb in February, 1955; that Martha was sitting in a car with Mrs. Nehring's husband, Don Batson and two other men; that she had suspected Mrs. Lamb of going with her husband but Martha claimed that she was with Batson. Later Martha invited witness to her home, and Martha told her that she had previously loaned Mr. Nehring $5 with which to gamble. About a week and a half after this Mrs. Nehring went to the Lamb home and told the defendant John Lamb that she thought Martha was running around with her husband. Defendant expressed surprise but said that he had been expecting someone to tell him something like that, and suggested that they attempt to catch Martha and Mr. Nehring together. Defendant tried to borrow a car for the purpose, but was unsuccessful.

At a later time Martha invited Mrs. Nehring to the Lamb home for coffee, and when Mrs. Nehring told Martha that she had no money for food, Martha loaned her $5. She saw the baby while she was there. She said: "He seemed like any baby, he did seem thin, but a lot of babies are thin." The evidence of this witness did not tend to show neglect of the children by either defendant, except that Mrs. Lamb left them with baby-sitters while she visited with her boy friends.

Mrs. Johnnie Smith, a waitress at John's Cafe, testified for the State, and said that she had known Martha Lamb for about five months and knew that she had been running around with Leon Nehring since the first of the year. She said that she and Mrs. Lamb were in a car with one Billy Dean Reimer when he was arrested for cashing hot checks. The women were questioned by the officers about Reimer's crime, but were not held. She said that Martha was not with Reimer, but "was in the crowd".

Witness said that she had kept the Lamb children a few times while Martha went to town, took one of them to the doctor, or went out to purchase groceries, and had been with Martha when she was dating Nehring, and had told Mrs. Nehring, but not Lamb.

This witness said that although she had been in the Lamb home several times, she had never seen the children mistreated. There was always sufficient food when she was there. On the day of the arrest Martha had borrowed money from witness with which to purchase sandwiches for the children. Mrs. Lamb had borrowed her car the night before so she could go to the Air Base for her allotment check. She said that she had loaned money to both John and Martha, and that John always paid it back. Witness further stated that in the past three or four months she had gone with Mrs. Lamb four or five times to take the children to the clinic for check-ups; that they took Cathy to the clinic

for treatment of eczema about April 27, and Martha brought home some medicine.

Edwin Knox, an employee at the Lip-So Awning Company, had gone to the Lamb home to give the older children a dog, but it snapped at them so that two days later he returned and picked it up. At the time of his visit, on April 24, John Lamb was at home and looked after the children while witness took Martha to the dairy where she bought three or four gallons of milk. On the trip to the dairy she told Knox that she was short of money because she had loaned $32.50 to Leon Nehring to make a week's payment for child support.

Witness had been to the Lamb home with Leon Nehring, Mrs. Johnnie Smith and the boy she was going with, but the defendant John Lamb was not there. Witness did not in his testimony state any circumstance to indicate neglect of the Lamb children, except what might be inferred by the absence of the mother from the home for intervals while her husband was at work.

There was evidence that Mrs. Lamb had permitted two teen-age run-away girls to stay in her home for a short time, but had accompanied her husband to the police to have the girls picked up.

At the close of the evidence for the State, defendants interposed a demurrer, which was by the court overruled, and exceptions were taken to the ruling. We shall mention a few of the high points of defendant's undisputed evidence before commenting on this ruling of the court.

The defendant Lamb introduced evidence of officers at the Vance Air Base to show his good character, and that he had allotted $156.50 per month to his wife to help take care of her expenses and those of the children. Defendant had even washed, cooked and cleaned for the children at nights. The evidence further showed that his wife was unable to manage money or stay within a budget, and she had for a short time moved with the children back to her former home at Okmulgee, in an effort to cut down expenses, but she ran charge accounts there and got defendant further in debt, so that he obtained help

from the Judge Advocate General's department in preparing for him a budget and pro rating money for payments on his debts. He ran an ad in an Enid paper notifying the public that he would not be responsible for his wife's debts, but she still got credit. He had even induced his wife, Martha, to take treatments from the Base psychiatrist, who found no illness, but that her mental complaints were due to the responsibilities of being a wife and mother. She wanted a divorce, but John Lamb wanted to remain with the wife to provide for the children and afford them the love of a mother.

The evidence disclosed that the defendant did not know about his wife loaning grocery money to others. He knew, however, that the family was practically out of groceries on Monday, May 2, but a check was due that day but did not come until the next day, Tuesday, and he and his wife were in pursuit of the check and groceries when the officers invaded his home, and they arrived home between 3:30 and 4 P.M. with $26 worth of groceries. He thought that his trouble with the officers stemmed from his resentment of remarks that the county attorney had made to him about his wife going out with other men. He had chosen to believe her unshakable reiteration that although she had been in the company with men, it was in company with others, and that she had never had any extra-marital relations with any other man. Defendant had gone without his lunch much of the time, and had worked extra in the officers' mess at the Air Base to earn extra money with which to pay his debts. His wife had purchased a television on time; and although they possessed no automobile, there was a gas bill of $34, and a baby-sitter bill that he knew nothing about in the sum of $37. Defendant swore that when the officers took the children away there was flour, bread, eggs, bacon, frozen orange juice in the ice tray, baby cereal and baby food in the house. The flour was in one of the cannisters not shown by the officers to have been opened or inspected. There was evidence that the clothing for the children was adequate, and the parents had just received a box of clothing from the

paternal grandmother, who often sent items of clothing.

Capt. Harry H. Dunbar, hospital executive officer at the Vance Air Base, testified that the hospital records showed concerning the Lamb children that Johnny Lamb was seen 23 times between April 7, 1952 and April 20, 1955. Larry Lamb had been seen 18 times between April 2, 1952 and May 2, 1955, and Cathy Lamb had been seen 11 times between October 27, 1953 and April 27, 1955, which was right up to about the time of the arrest.

Johnny Lamb had been treated for recurrent tonsilitis and an operation had been scheduled but Mrs. Lamb did not bring him in. The record listed Johnny as a well-developed child, active, with several diagnoses of diarrhea and common colds but no malnutrition. On October 21, 1954, he was treated for dandruff and a prescription was given. On November 23, 1954, he was treated for ringworm on face and body and a prescription was given.

Larry Lamb was taken to the Base Hospital on May 2, 1955, by his mother, the day before the Lambs were arrested. He was treated for a mashed finger caused by a falling window. On January 13, 1955, he had been treated for a cold and infected right ear. Other treatments were for a burn on right elbow, and enlarged tonsils.

Tommy Lamb was born in the Base Hospital on December 15, 1954. There was no further record of medical attention there. The receptionist at the desk had reported to Capt. Durham that on April 20, 1955, Mrs. Lamb had stated that she was having trouble with the baby's diet. From the other evidence it was shown that the baby was on a formula of Pet milk and Karo Syrup and when the medicine did not come that had been promised by Dr. Shuttee, Mrs. Lamb put the baby on homogenized milk, in that all her other children had been put on homogenized milk when they were less than four months old.

There was much other evidence not necessary to recite. The State offered no rebuttal evidence. The record does show that the court awarded the children to the paternal grandparents of the children who lived at Durant. The proceedings described further resulted in a divorce action between John and Martha Lamb.

Our task is to determine where in the evidence there were facts shown as to one or all of the children to prove that the defendant wilfully failed to perform one or more of the duties required by the statutes, Tit. 21 O.S.1951 § 852, supra. And in this connection on the allegation that one "wilfully" committed an act is the same as that he "knowingly" committed the act. Bohannon v. State, Okl.Cr., 271 P.2d 739.

First, there is no evidence that defendant failed to furnish adequate shelter; or, second, that he failed to furnish necessary clothing. The evidence tended to show that the wife did not run the washing machine as often as a good housewife and mother should, but defendant would "pinch-hit" at night by washing and scrubbing, and would even help cook. He was busy all day with his employment. Third, the expert medical evidence produced by the State refutes the idea that defendant ever knowingly failed to furnish medical treatment for his children. The record at the hospital at the Air Base further refutes any such idea; and, fourth, the State's evidence fails to show that the defendant knowingly failed to provide food for his children. The day the officers took the parents in charge the three older children had been fed beans, bread, cake and milk, the baby had been fed homogenized milk. The wife had without the knowledge of the husband loaned out part of her grocery money, and the pantry was about depleated, according to the State's witnesses, who did not thoroughly search the cabinets, cannisters, and freezing trays of the refrigerator. This may be accounted for by an inhibition, conscious or otherwise, produced by the fact that they were not acting under authority of a search warrant. But on that day, long before dinner or supper time, the defendant appeared at his home with $26 worth of groceries.

The evidence of the State and as a whole conclusively shows that the defendant in this case was doing everything within his power to adequately provide for and to

perform every duty specified in the statute, 21 O.S.1951 § 852.

There was no evidence on the part of the State that the three older children did not receive three meals a day. The State presented no medical evidence as to their physical condition. It was apparently not even thought necessary to have the physician examine the two older children. And the doctor said that Cathy did not show signs of malnutrition or hunger. The whole case resolved down to a consideration of the four-months old baby, Tommy, shown definitely to have been suffering from malnutrition, so much so that the juvenile officer, Mrs. Johnson, said that she got so mad on viewing the baby that dishes could have been stacked to the ceiling and she would not have noticed it. She said that, "I was so mad that I did not care whether there was anything [food] found there or not." This seems to have exemplified the attitude of several of the officials.

Without doubt every person seeing the baby, and we have carefully viewed the pictures, were justified in a welling up of pity and sympathy for it. But malnutrition can exist regardless of the amount of food available, or even eaten. It is a matter of bodily assimilation. See Stedman's Medical Dictionary. The State's own expert witness, Dr. Shuttee, said: "No, I wouldn't say it [the baby] had been neglected. I will say that the child was malnourished."

Practically all of the State's witnesses, except the physician, seemed to condemn the parents because the baby had been fed homogenized milk rather than canned milk or ingredients of some formula. But the State's doctor said that if some other formula did not agree with the baby it would be proper to try homogenized milk. He said in effect that he could not condemn that. The County Judge personally quizzed the witness about the homogenized milk.

Dr. Shuttee changed the formula and placed the baby in the hospital where it would be sure to be kept clean and dry and its feeding could be made on regular schedule, and he added vitamins and cod liver oil, and the baby began to improve.

The baby did develop measles within two or three days after entering the hospital, and the incubation period was shown to have been from 14 to 21 days, so that such might have had something to do with it having vomited up the formula it was on and that caused the mother to change to homogenized milk.

As said by Judge Armstrong in the early days of this court in Owens v. State, 6 Okl.Cr. 110, 116 P. 345, 346, 36 L.R.A.,N.S., 633, Ann.Cas.1913B, 1218; 12 A.L.R.2d 1049 (note):

"A reasonable construction of these statutes would be that the parent is required to furnish the necessary food, clothing, shelter, and medical attendance looking to the preservation of the health, as well as the life, of the child. The law does not contemplate the calling of a physician or the furnishing of medical attendance for every trivial complaint with which a child may be afflicted. A reasonable amount of discretion is vested in the parents charged with the duty of maintaining and bringing up infant children. We think that the correct rule would require the furnishing of medical treatment in such a manner and on such occasions as an ordinarily prudent person, solicitous for the welfare of his child and anxious to promote its recovery, would provide."

An examination of the authorities from other jurisdictions with statutory provisions similar to ours is that the obligation of the father must be measured with reference to his ability, honestly exercised, and with regard to his financial resources, and that the parent performs his duty when he provides for his child whatever is necessary for its suitable clothing and maintenance according to their situation and condition in life. See 36 A.L.R. 866–867; 12 A.L.R.2d 1047 (note). We do not find where a conviction has ever been had under the statutory provision for a mistake in judgment as to the feeding of a child, where the food given was shown by medical evidence to be that prescribed by physicians at times. The fact of the unkemptness of the children or the disorderliness of the home are not matters covered by the statute in question.

We can find no basis in the evidence to charge that the malnutrition of Tommy Lamb was knowingly or wilfully brought about by any act on the part of the defendant. A child is certainly neglected to be left regularly with any and all persons willing to baby-sit. Even if the very best of food and formulas were furnished it could not be certain that they would be properly and promptly fed to the child. But the defendant had to arise early each morning in order to be ready for duty at the Air Base at 7 A.M. He returned to his home after 4 o'clock. The evidence is conclusive that defendant only recently learned of the numerous baby-sitters and the conduct of his wife. He ran one baby-sitter off. He was endeavoring to avoid a divorce, and it is the policy of the State and the courts to aid and encourage the keeping together of parents and children and preventing the breaking up of homes whenever there is reasonable possibility. Such matters can not be disposed of summarily, but require a sympathetic attitude, time and patience. The defendant from the evidence was doing the best that under the circumstances he was capable of doing. The funds that he furnished seem to have been quite adequate if properly used. The wife had given her young girlhood to rapidly bringing children into the world. This may have in part accounted for the frailty of the baby. She seems to not have had the training and ability to properly manage a household. We are not, as we have said, passing on whether or not her admitted acts and conduct constituted a violation of the statute here involved, but we find no basis in the evidence to charge the defendant with any neglect chargeable to the wife, whether that neglect might be covered by the statute or not.

The burden was on the State to show as to the defendant Lamb a violation of the statute on which the charge made was predicated. It failed to do so.

The judgment appealed from is reversed, the case remanded and it is ordered that the defendant be discharged.

JONES, P. J., and BRETT, J., concur.