THRIFTIMART, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3079-69. Filed January 31, 1973.

*William Currer*, for the petitioner.
*Norman McNeil* and *Robert Casey*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes for the years and in the amounts as follows:

| 52–53 week year ended | Amount |
| --- | --- |
| Mar. 27, 1965 | $353,377 |
| Mar. 26, 1966 | 115,412 |

Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following:

(1) Whether petitioner, a self-insurer under the California Workmen's Compensation Insurance Act, properly deducted as an accrued expense at the close of each of its fiscal years an amount the administrator of the workmen's compensation insurance program estimated would be required to pay for medical expense and compensation over the following years to petitioner's employees who had been injured in the current or prior years.

(2) Whether petitioner is entitled to deduct as an accrued expense at the close of each of its fiscal years ended March 27, 1965, and March 26, 1966, amounts it would be required under its union contract to pay to some of its employees during the following year because of sick leave which they had not used during the prior year, and amounts which it would be required to pay for sick leave for the following year to an employee who did not use such sick leave or voluntarily resigned or who had been discharged for cause prior to the anniversary date of his employment.

(3) What amount, if any, is petitioner entitled to deduct as a charitable contribution to the Salvation Army because of a charitable lease to the Salvation Army of portions of its building?

(4) Is petitioner entitled to deduct depreciation with respect to any portion of its building for which it is entitled to a deduction of the rental value as a charitable contribution?

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner Thriftimart, Inc., is a California corporation with its principal place of business in Los Angeles, Calif.

Smart & Final Iris Co. Wholesale Grocers, an Arizona corporation, is a wholly owned subsidiary of petitioner doing business only within the State of Arizona.

Petitioner and its subsidiary filed consolidated corporate Federal income tax returns for the taxable years ended March 27, 1965, and March 26, 1966, with the district director of internal revenue at Los Angeles, Calif.

Petitioner during the years here in issue maintained its books and records and filed its corporate tax returns on an accrual method of accounting.

Petitioner is principally engaged in the wholesale and retail grocery business. It operates a chain of retail grocery supermarkets under the name "Thriftimart" and a wholesale grocery business under the name and style "Smart & Final Iris Company, a division of Thriftimart, Inc."

### 1. *Workmen's Compensation Issue*

Petitioner is now and was at all times material herein, subject to the Workmen's Compensation Insurance and Safety Laws of California. Petitioner is self-insured under the provisions of the Workmen's Compensation Insurance and Safety Laws of California and has been self-insured since March 30, 1952.[1]

---

[1] Cal. Labor Code, secs. 3701, 3703, and 3704 (West 1971), provides:

Sec. 3701. Deposit of bond or securities by self-insuring employer

The Director of Industrial Relations may require a self-insuring employer to deposit either a surety bond or securities, approved by the Director of Industrial Relations, and in an amount determined by the director, to secure incurred liabilities for the payment of compensation as compensation is defined in Section 3207.

(a) Surety bonds shall be deposited with the Director of Industrial Relations.

(b) Securities shall be deposited with the State Treasurer. Securities shall be accepted by the State Treasurer for deposit and shall be withdrawn only upon written order of the Director of Industrial Relations.

Sec. 3703. Administration of compensation benefits by self-insurer

So long as the certificate has not been revoked, and the self-insurer maintains on deposit the requisite bond or securities, the self-insurer shall not be required or obliged to pay into the State Compensation Insurance Fund any sums covering liability for

600

Petitioner elected to become self-insured under the provisions of the California law in lieu of insuring itself against liability with a commercial insurance carrier. Since March 30, 1952, petitioner has maintained a certificate of consent to self-insure issued to petitioner by the director of industrial relations of California. In order to maintain the certificate of consent to self-insure, petitioner is now, and was at all times material herein, required by the director of industrial relations to deposit a surety bond with the State of California in an amount determined by the director of industrial relations.

Petitioner has established and maintains on its books a reserve account for workmen's compensation self-insurance. The reserve account is used to ascertain the amount of the surety bond which petitioner is required to deposit with the director of industrial relations of the State of California. The amount of the surety bond posted by petitioner is 125 percent of the amount in this reserve account on petitioner's books for workmen's compensation self-insurance.

Since petitioner became self-insured in 1952, the self-insurance has been administered by an independent insurance management firm, R. L. Kautz & Co. (hereinafter referred to as Kautz). Kautz provides petitioner with an Annual Consolidated Operating Statement of petitioner's workmen's compensation self-insurance account, and with an annual Workmen's Compensation Liability Self-Insurance Experience Report for both its retail division, Thriftimart, and its wholesale division, Smart & Final Iris Co.

Kautz sets up a separate account for every workmen's compensation case opened for petitioner upon receipt of an employer's report of a work injury and the doctor's first report. The account is set up as the best estimate of the person at Kautz who handled the case based on what experience has shown to generally be the amount it will ultimately cost to resolve the claim, including compensation and medical costs. The estimated cost is spread over a period of time of up to 5 years.

The amount set up in this account by Kautz is entered as a liability on petitioner's books and records. The entries on petitioner's books

compensation excepting life pensions; and the self-insurer may fully administer any compensation benefits assessed against the self-insurer.

Sec. 3704. Payment by surety bond

The appeals board, in the event that the surety on such bond becomes liable for payment thereunder or resort must be had to the deposited securities or the interest thereon, or both, may direct the order, manner, and amounts of payment due the beneficiaries. Payment by the surety pursuant to the order of the appeals board or when ratified by the appeals board constitutes a full release of the surety's liability under the bond to the extent of such payment, and entitles the surety to full reimbursement by the principal or his estate, including necessary attorney fees and other costs and expenses, without prior claim or proceedings on the part of the injured employee or other beneficiaries.

are based upon the monthly reports provided to petitioner by Kautz. These entries were made in an account entitled "Reserve for Workmen's Compensation Insurance." At the end of petitioner's fiscal year the final adjustments made in the reports furnished to petitioner by Kautz were reflected in this account. The adjusted amount in this reserve account at the end of the year is deducted by petitioner as an ordinary and necessary business expense.

The amount set up by Kautz for each injured employee is periodically reviewed by Kautz to determine whether there has been any change in the status of the case which would necessitate an adjustment in the amount it is estimated will ultimately be paid to the employee. In the event that Kautz adjusts the estimated amount to be paid an injured employee, petitioner adjusts its liability reserve account to agree with the adjustment made by Kautz.

Generally, when an employee of petitioner has been injured, liability under the Workmen's Compensation Statute is admitted. However, there are some cases in which liability is contested such as where a question of where the injury occurred exists or whether the claimed liability is for a preexisting condition. Cases which are contested by petitioner are examined by the Industrial Accident Commission.

Of the amounts of deduction totaling $563,573 and $636,365 claimed by petitioner on its tax returns for its fiscal years ended March 27, 1965, and March 26, 1966, respondent disallowed the amounts of $177,212 and $131,370, respectively, as representing reserves for future losses. The balance of the amounts included in petitioner's deductions for insurance costs consisted of all amounts actually paid during the years for workmen's compensation benefits, together with all amounts paid by petitioner for fees charged by Kautz, the cost of reinsurance premiums and the cost of surety bonds.

## 2. *Accrued Sick Pay Issue*

In 1959 petitioner entered into an agreement with the Retail Clerks Union, local 770. This agreement styled "Retail, Food, Bakery, Candy, and General Merchandise Agreement" was for the period April 1, 1959, to March 31, 1964.

Under the agreement, each employee covered by the agreement was entitled to 6 days of sick leave with pay each year. The employee was not entitled to accumulate sick leave from year to year, nor was he entitled to be compensated for any unused sick leave days.

In 1964 petitioner entered into an agreement with the Retail Clerks Union, local 770. The agreement styled "Retail, Food, Bakery, Candy, and General Merchandise Agreement" covered the period commencing April 1, 1964, and ending March 31, 1969.

The 1964 agreement contained the following provision with respect to sick leave and pay for unused sick leave:

A. SICK LEAVE ENTITLEMENT.

1. Eligibility. All employees covered by this Agreement who have been continuously employed by the Employer for a period of at least one (1) year shall be entitled to six (6) days' sick leave with pay, and on each anniversary date of employment thereafter, he shall be entitled to six (6) days' sick leave with pay; however, such sick leave benefits shall not accumulate from year to year. Sick leave shall be payable only during the first week of absence, beginning with the second working day's absence due to non-hospitalized illness or injury and shall not be payable if the employee is receiving Supplementary Disability Benefits.

  &#42;    &#42;    &#42;    &#42;    &#42;    &#42;    &#42;

E. UNUSED SICK LEAVE PAID. For the employee's second and succeeding anniversary dates of employment falling on or after April 1, 1964, any unused sick leave to which an employee may be entitled shall be paid on the employee's anniversary date of employment. After a year's employment, the employee, in the event of termination, shall be entitled to a pay-off of unused sick leave entitlement and to a pro-rata payment of accumulated sick leave since his last anniversary date. The pro-rata payment of accumulated sick leave since his last anniversary date shall not be paid to an employee who is discharged for proven or admitted dishonesty, or who quits voluntarily.

Petitioner interpreted the 1964 agreement to mean that each employee working for the company on April 1, 1964, became entitled to sick leave at the rate of one-half day each month for the number of months between April 1, 1964, and the anniversary date of the employee's employment, and on his employment anniversary date became entitled to 6 days' sick leave for the following year. Each employee hired after April 1, 1964, became entitled to 6 days' sick leave for his first year and each succeeding year.

Any employee who had been employed for 1 year or more as of April 1, 1964, so that his second anniversary date of employment would fall after April 1, 1964, would be paid on the anniversary date of his employment for any unused sick leave days for the period April 1, 1964, to the anniversary date of his employment, except if his employment were terminated prior to the anniversary date of his employment he would be paid for his unused sick leave upon termination of his employment. Any employee whose first anniversary date of employment fell after April 1, 1964, would become entitled to payment for the number of days of sick leave for the period April 1, 1964, to the anniversary date of his employment which he had not used, but would not be paid for that unused sick leave until the next anniversary date of his employment (the second anniversary date of his employment falling after April 1, 1964) unless his employment were terminated before that anniversary date in which event he would be paid for the unused sick leave which he had as of the anniversary date of his employment.

On the anniversary date of their employment falling after April 1, 1964, all employees were credited with 6 days' sick leave which they could use during the ensuing year. If the employment of any employee was terminated during that period, he was entitled to be paid for unused sick leave on a pro rata basis of one-half day per month from the anniversary date of his employment to the date of his termination. However, an employee who voluntarily quit or who was discharged for proven or admitted dishonesty would not be paid for his accumulated sick leave accrued since the last anniversary date of his employment prior to the termination of his employment.

As of March 27, 1965, the end of the first fiscal year that petitioner had operated under the 1964 employment agreement, petitioner had paid to employees whose second anniversary date of employment had fallen during that fiscal year $147,917. Petitioner had accrued on its books an amount of $181,853 as sick leave pay for such leave accumulated for the period April 1, 1964, to the first anniversary date of employment of employees, which amount it was obligated to pay during the ensuing year either upon termination of employment or the second anniversary date of such employee's employment. As of March 27, 1965, petitioner set up on its books a further accrual of $127,638, which represented the pro rata part of sick leave of employees from the anniversary date of their employment falling after April 1, 1964, to March 27, 1965, on the basis of one-half day a month. This accrual represented the amount for such unused sick leave by the employee as of March 27, 1965, which petitioner would be required to pay on the anniversary date of the employee's employment following March 27, 1965, unless the employee voluntarily quit or was discharged for dishonesty prior to the anniversary date of his employment. In the latter event petitioner was not required to make the payment.

Petitioner on its Federal income tax return for the fiscal year ended March 27, 1965, deducted for sick leave pay the amount of $457,408 composed of the three figures set forth above. On its income tax return for the fiscal year ended March 25, 1966, following the same system petitioner deducted a total of $202,696 for sick leave pay. This amount was composed of $204,446 actually paid as sick leave during the 1966 fiscal year plus $193,890 which petitioner would be required to pay during the ensuing fiscal year for previously accrued sick leave referred to as "nonforfeitable" accrued sick leave and $113,851 of "forfeitable" sick leave accrued which petitioner would have to pay during the ensuing year unless the employee voluntarily quit or was discharged for dishonesty. To compute the total of $202,696 petitioner subtracted from the $512,187 total of the figures for actual payment and the accrual of forfeitable and nonforfeitable sick leave the $309,-

491 of reserve for nonforfeitable and forfeitable sick leave pay it had deducted at the end of its fiscal year 1965.

Respondent in his notice of deficiency disallowed $309,491 of the deduction claimed by petitioner for sick leave pay for its fiscal year ended March 27, 1965, and increased the deduction claimed by petitioner in its fiscal year 1966 by $1,750, the difference between the $202,-696 deduction claimed by petitioner and the $204,446 actual payments for unused sick leave made by petitioner in its fiscal year ended March 26, 1966. Respondent explained his adjustment as follows:

It is determined that for the 52–53 week year ended March 27, 1965 an accrual for sick pay totaling $309,491.00 included within other deductions and within the deductions for salaries and wages is disallowed for the reasons that you have failed to establish that a liability existed in such amount or that the deduction of the accrued amount did not constitute an unauthorized change from prior accounting methods. In the 52–53 per week year ended March 26, 1966, a deduction is allowed to the extent of $1,750.00 representing amounts in that year charged against the erroneous accrual of the prior year.

### 3. Charitable Contribution Issue

Petitioner's headquarters building in Los Angeles contains, in addition to the offices which petitioner uses, several components which customarily petitioner had leased to others. The portion of the building which has been leased consisted of a 1,465-seat theater, a bank, a restaurant, an auditorium-type room on the third floor referred to as the Gold Room, offices on the ground floor, and a penthouse on the top or fifth floor of the building. Commencing in 1961 the neighborhood in which petitioner's building was located began to change and movie houses began to move out of the area.

On June 1, 1960, petitioner leased to Ritz Anglewood Theatre Corp. the theater portion of its headquarters building. The lease agreement called for petitioner to receive $700 per month plus 12½ percent of box office receipts in excess of $67,200 per year.

By letter agreement dated October 20, 1961, the lease was amended, reducing the rental to $500 per month plus 12½ percent of box office receipts in excess of $48,000 per year. The lease was again amended on December 1, 1962, at which time the rent was reduced and Calvin Arbuthnott and Joann Donnert were substituted as lessees. On August 16, 1964, these tenants vacated the premises.

On February 3, 1961, petitioner leased the portion of its headquarters building known as the penthouse to the Variety Club of Southern California. The term of the lease was 4 years at a monthly rental of $500 per month, subject to the tenants' obtaining liquor licenses. On March 20, 1963, the lease was amended to reduce the rent from $500 to $300 per month.

Sometime prior to August 25, 1964, officials of the Salvation Army were seeking office facilities because of lack of space in the building the

Salvation Army was then occupying. Someone brought to the attention of these officials the possible availability of office space in petitioner's building. Officers of the Salvation Army visited petitioner's building and determined that the penthouse could be used by them for the needed office space. On or about August 25, 1964, an attorney for petitioner prepared a document entitled "charitable lease" as an agreement between petitioner and the Salvation Army whereby petitioner leased to the Salvation Army the penthouse, the Gold Room, and the theater for a term of 3 years. The lease called for no rent but petitioner's attorneys put in a provision that the "fair annual rent" for the premises was $43,550 per year. The lease provided that the Salvation Army should use the demised premises solely for the charitable, educational, and eleemosynary purposes for which it was organized and for no other purpose. It provided that the tenant should not make any use or permit any use of the premises which would increase existing rates of insurance on the building containing the premises. The lease recited that the leased premises contained furniture, furnishings, and equipment, and that the motion-picture theater contained equipment to make it fully operational, and provided that the tenant might remove any such furniture, furnishings, or equipment, provided that any such items removed be "replaced by items of comparable or greater value, which serve the same function as the items so removed."

The lease provided that the tenant would procure and keep in force public liability insurance protecting the landlord and tenant against any personal or property damage claims. The lease provided that the tenant should keep the premises and the furniture and fixtures in good condition and state of repair, including the maintenance of the air conditioning for the premises and the elevators from the lobby to the third and fifth floors. The lease contained a provision that if the tenant failed to perform any of the terms or conditions of the lease, the landlord might terminate the lease by serving written notice of such termination on the tenant and further provided that in the event the landlord "sells the building containing the demised premises, Landlord may terminate this Lease."

On September 3, 1964, personnel of the Salvation Army moved into the penthouse, using the bedrooms, living room, and other rooms in the penthouse as offices. The Salvation Army spent about $800 in painting and repairs on the penthouse offices. The lease was executed on behalf of the Salvation Army on January 21, 1965. The Salvation Army did not use the Gold Room at all in the year 1965 but did use it in November and December of 1966 and during these same two months in 1967. The only use the Salvation Army ever made of the theater was to store a portable display unit on the stage for a few days in late 1965.

During the period that the lease between petitioner and the Salvation Army was in effect, petitioner, after obtaining permission from

officials of the Salvation Army, used the theater and the Gold Room on several occasions for stockholders meetings and on one occasion the Gold Room was used for a social function by a club to which the wife of petitioner's president belonged. The Salvation Army had no use for the theater and up until November 1966 had no use for the Gold Room. It was suggested to officials of the Salvation Army that it might attempt to use the theater by producing some plays or for some special event for an audience, but it never was able to use it in that way, and because of its dilapidated condition at the time the lease was entered into, it would not have been satisfactory to use in such a manner.

On March 1, 1967, the theater was subleased by the Salvation Army to the Inner City Cultural Center, a charitable corporation. Petitioner's president made the suggestion of the sublease, and he negotiated the terms of the sublease. The Inner City Cultural Center did extensive repair work to the theater. The Salvation Army received no money from the sublease of the theater.

The charitable lease between petitioner and the Salvation Army was renewed in 1967, extending the original term of the lease by 4 years 6 months and 6 days.

The fair rental value of the penthouse as office space during the years here in issue was $12,000 per year. It would have been difficult, if not impossible, to have rented the theater during the years here in issue as a theater. If it could have been so rented, the rent would have been nominal. The best use to produce revenue from the theater space considering the location of petitioner's building, was as a warehouse. The fair rental value of the theater space as a warehouse during the years here in issue was $12,000 a year. The fair rental value of the Gold Room during the years here in issue was $4,223 a year.

Petitioner on its Federal income tax return for its fiscal year ended March 27, 1965, claimed a deduction for a charitable contribution in the amount of $109,696 because of its lease of premises to the Salvation Army. Petitioner also continued to claim depreciation deductions with respect to the portions of the office building covered by the charitable lease.

Respondent in his notice of deficiency disallowed the entire $109,696 deduction claimed by petitioner and also disallowed $2,921 of depreciation for the fiscal year ended March 27, 1965, and $5,008 of depreciation for the fiscal year ended March 26, 1966, with the explanation that due to the fact that portions of the building were being used by the Salvation Army and not used for petitioner's business purposes or for the production of income, the depreciation allocable to those portions was disallowed for the periods that such nonbusiness use applied.

OPINION

## 1. *Workmen's Compensation Issue*

Section 461, I.R.C. 1954,[2] provides that a deduction allowed under the Code shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income. Under an accrual method of accounting an expense becomes accruable and deductible for income tax purposes if (1) during the taxable year all events have occurred which establish a definite liability on the part of the taxpayer to pay such an expense, and (2) the amount of such liability is determinable with reasonable certainty within the taxable year. *Dixie Pine Co.* v. *Commissioner*, 320 U.S. 516 (1944); sec. 1.461-1(a)(2), Income Tax Regs.

This record shows that in some instances petitioner contested its liability under the workmen's compensation provisions.[3] It is obvious without further discussion that under the holding of the Court in *Dixie Pine Co.* v. *Commissioner, supra*, there had not occurred within the taxable year all of the events establishing a liability of petitioner in those cases in which petitioner was contesting whether it was liable to compensate the employee for any injuries sustained or was contesting whether in fact any injury was sustained during the performance of services by the employee incidental to his employment.

---

[2] All statutory references are to the Internal Revenue Code of 1954.
SEC. 461. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION.
(a) GENERAL RULE.—The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income.

[3] Sec. 3600, Cal. Labor Code Ann. (West 1971), provides as follows with respect to the circumstances which make an employer liable to an employee for the compensation provided for in the Code:
Sec. 3600. Liability for compensation; conditions of compensation
Liability for the compensation provided by this division, in lieu of any other liability whatsoever to any person except as provided in Section 3706, shall, without regard to negligence, exist against an employer for any injury sustained by his employees arising out of and in the course of the employment and for the death of any employee if the injury proximately causes death, in those cases where the following conditions of compensation concur:
(a) Where, at the time of the injury, both the employer and the employee are subject to the compensation provisions of this division.
(b) Where, at the time of the injury, the employee is performing service growing out of and incidental to his employment and is acting within the course of his employment.
(c) Where the injury is proximately caused by the employment, either with or without negligence.
(d) Where the injury is not caused by the intoxication of the injured employee.
(e) Where the injury is not intentionally self-inflicted.
(f) Where the employee has not willfully and deliberately caused his own death.
(g) Where the injury does not arise out of an altercation in which the injured employee is the initial physical aggressor.

In most instances petitioner conceded that the injury was one described in the California Code which caused it to be liable to pay compensation to the employee if compensation was due to the employee within the provisions of the California law.[4]

The record shows that in many instances where petitioner admitted that the injury was one which made it liable to pay the compensation provided for by statute, it contested the amount of payment claimed by an injured employee. The record shows that there are a number of instances in which petitioner set up a reserve for an injury to an employee and no amount was ever paid to the employee. The record does not indicate the reason no amount was ever paid. It may have been that petitioner successfully contested its liability under the statute in these instances or it may have been that petitioner admitted its liability under the statute but never became liable for any payment to the employee. It is clear from the California law (fn. 4) that petitioner did not become liable for payment of any compensation to an employee until such employee actually incurred medical expenses or was away from work for a period in excess of 7 days. Therefore, where petitioner admitted liability if any arose, it did not in fact have any liability for any payment of any specific amount to any employee until the conditions of that employee having medical services or being away from work occurred.

In *Simplified Tax Records, Inc.*, 41 T.C. 75, 79 (1963), in disallowing a deduction to the taxpayer for a reserve for the estimated future cost of preparing subscribers' returns for a fee which had been prepaid, we stated:

We think the issue here is controlled by the recent decisions of the Supreme Court in *Schlude* v. *Commissioner*, 372 U.S. 128 (1963), *American Automobile Assn.* v. *United States*, 367 U.S. 687 (1961), and *Commissioner* v. *Milwaukee & Suburban Transport Corp.*, 367 U.S. 906 (1961), which require a decision against the taxpayer herein. While it is true that the *Schlude* and *American Automobile* cases were concerned with the deferral of income rather than the deduction of estimated future expenses, the Court remanded the *Milwaukee & Suburban Transport* case, which did involve the deductibility of estimated expenses, "in the light" of the *American Automobile* case, and on remand the Court of Appeals for the Seventh Circuit vacated its prior decision permitting the deduction of anticipated damage claims and reinstated the decision of this Court denying such deduction on the authority of the *American Automobile* case. See *Milwaukee & Suburban Transport Corporation* v. *Commissioner*, 293 F. 2d 628 (C.A. 7, 1961). While it can be argued that there are technical distinctions in deferring prepaid

---

[4] Sec. 4600, Cal. Labor Code Ann. (West 1971), requires that the employer provide the medical and hospital treatment reasonably required to cure or relieve the injury received by the employee.

Secs. 4650, 4652, 4653, 4654, 4655, 4656, and 4657, Cal. Labor Code Ann. (West 1971), provide for the payments to be made by an employer in the event the employee must remain away from work for 7 days or is unable to perform his ordinary duties because of an injury received.

Secs. 4658, 4659, and 4660 of the California Labor Code provide for the method of compensation in case of permanent disability, and secs. 4700, 4701, and 4702 provide for payment of a burial expense and death benefits where the employee dies as a result of a compensable injury and there is a surviving dependent.

income and deducting estimated future expenses in cases like this the net result is the same and we think the same principles of tax accounting and the Commissioner's authority should be applied to both techniques.[3] As said in *American Automobile Assn.* v. *United States, supra,* the prepaid dues were credited to a reserve "as deferred or unearned income reflecting an estimated future service expense to members." [Fn. omitted.]

Here, just as in the case of *Simplified Tax Records, Inc., supra,* as well as in the cases of *Schlude* v. *Commissioner,* 372 U.S. 128 (1963), and *American Automobile Assn.* v. *United States,* 367 U.S. 687 (1961), no payment would be due by petitioner to an injured employee until the injured employee was away from work or had medical attention. In *Schlude* v. *Commissioner, supra* at 136, the Court stressed the fact that the deferral was with respect to lessons to be arranged at a future time and that if demand for the services was not made, there was no obligation of refund, and concluded that portion of its opinion with the statement, "Clearly, services were rendered solely on demand in the fashion of the *American Automobile Association* and *Automobile Club of Michigan* cases."

In the instant cases there exists the same uncertainty as to whether the injured employee will remain away from work and will need medical services.

Furthermore, in this case there exists numerous other contingencies which preclude the amount of any liability which petitioner may incur in connection with any case from being ascertained with reasonable accuracy. The amount of such liability is subject to the contingencies of a preexisting malady, doubtful or imprecise medical diagnosis, development of medical complications, or changed conditions. The amount set up for a claimant in the reserve account was subject to change and adjustment and the ultimate resolution of the case could hinge upon a negotiated settlement or even examination by the Industrial Accident Commission.

The reserve accounts established by Kautz on behalf of petitioner were mere estimates of liability which amount to nothing more than a reserve for contingent liabilities.

Petitioner contends that accruals to its reserve for workmen's compensation self-insurance constitute a permissible accounting method and are essential to accurately reflect its net income. Petitioner further contends that a liability need not be absolutely fixed in order to constitute a proper accrual and cites *Gillis* v. *United States,* 402 F. 2d 501 (C.A. 5, 1968) ; *Pacific Grape Prod. Co.* v. *Commissioner,* 219 F. 2d 862 (C.A. 9, 1955), reversing and remanding 17 T.C. 1097 (1952) ; and *Harrold* v. *Commissioner,* 192 F. 2d 1002 (C.A. 4, 1951), reversing and remanding 16 T.C. 134 (1951). These cases are all distinguishable on their facts from the instant case. All of these cases deal with definite contractual liabilities and concern only the degree of certainty as to

the amount necessary for accrual. The instant case involves estimates of possible liabilities. There may be no liability in those cases in which petitioner contests liability and in the cases where liability is admitted, such liability may be terminated by the death or by the recovery and return to work of the injured employee at any time during the succeeding years over which payment is estimated.

Petitioner also contends that where a Government agency requires certain accruals or reserves as a matter of law, the reserves are deductible, citing *Maryland Casualty Co.* v. *United States*, 251 U.S. 342 (1920), and *Ocean Accident & G. Corp.* v. *Commissioner*, 47 F. 2d 582 (C.A. 2, 1931), reversing and remanding 16 B.T.A. 1313 (1929). Both of those cases involve insurance companies which are accorded special tax treatment under the Code. Petitioner is not an insurance company and does not come within the provisions of the Code dealing with insurance companies. *Brown* v. *Helvering*, 291 U.S. 193 (1934). Moreover, both cases cited by petitioner involve reserves actually required by law. This record does not show that any reserve is required of petitioner by the California Labor Code, but rather shows that a self-insurer is required to post a surety bond which in petitioner's case was computed at 125 percent of the balance of petitioner's estimated outstanding workmen's compensation liability. Petitioner's reserve account may be appropriate for financial accounting purposes but it does not follow from this fact that it is deductible for Federal income tax purposes. See *Commissioner* v. *Lincoln Savings & Loan Assn.*, 403 U.S. 345, 359 (1971).

In *Spring Canyon Coal Co.*, 13 B.T.A. 189 (1928), affd. 43 F. 2d 78 (C.A. 10, 1930), certiorari denied 284 U.S. 654 (1931), we held that amounts paid into a reserve by a taxpayer as a self-insurer under the Utah Workmen's Compensation Act were not deductible from gross income as an ordinary and necessary business expense. In so holding we pointed out that we had uniformly held that amounts reserved for self-insurance were not deductible. The Tenth Circuit, in affirming our holding, stated that the amounts were not "expenses" but rather were sums "set aside" as a reserve against contingent liabilities and further stated (43 F. 2d at 79–80) :

True, it was more than a bookkeeping entry; it was an actual reserve, akin to that required of insurance companies, but nevertheless a reserve. It is significant that the reserves of insurance companies are deductible by virtue of a separate subsection which does not extend to mining companies. "Reserves to cover contingent liabilities * * * are not allowable as deductions." *Lucas* v. *American Code Co.*, 280 U.S. 445, 50 S. Ct. 202, 204, 74 L. Ed. 538; *United States* v. *Anderson*, 269 U.S. 422, 46 S. Ct. 131, 70 L. Ed. 347.

While the factual situation in *Spring Canyon Coal Co.* differs slightly from that in the instant case, the holding therein that a reserve for estimated liability of a self-insurer under a State workmen's com-

pensation statute is not deductible in computing taxable income is equally applicable here. The Supreme Court in *Commissioner* v. *Milwaukee & Suburban Transport Corp.*, 367 U.S. 906 (1961), remanded in the light of its holding in *American Automobile Assn.* v. *United States*, 367 U.S. 687 (1961), the case of *Milwaukee & Suburban Transport Corporation* v. *Commissioner*, 283 F. 2d 279 (C.A. 7, 1960), reversing on this point a Memorandum Opinion of this Court. In the *Milwaukee & Suburban Transport* case, on remand from the Supreme Court, 293 F. 2d 628 (C.A. 7, 1961), the Court of Appeals affirmed our holding disallowing a deduction claimed by a self-insured public carrier for estimated liability for accidents which had occurred, a reserve comparable to the reserve set up by petitioner herein for workmen's compensation liability.

There is no section of the Code specifically authorizing a deduction for amounts set up in a reserve such as petitioners reserve for workmen's compensation self-insurance. The Code specifically authorizes deductions for certain additions to reserves. The reserve set up by petitioner herein does not come within those statutory provisions. Petitioner's reserve for workmen's compensation self-insurance which may be useful for purposes of financial accounting does not thereby become a deduction in determining taxable income. Many reserves set up by prudent businessmen are not allowable as deductions in computing taxable income. *Lucas* v. *American Code Co.*, 280 U.S. 445, 452 (1930).

We therefore conclude that petitioner is not entitled to a deduction for its reserve for workmen's compensation self-insurance but is entitled to deduct only amounts actually paid for workmen's compensation benefits, together with all costs incurred in administering its self-insurance program.

### 2. *Accrued Sick Pay Issue*

Petitioner takes the position that its total accrual for unpaid sick leave was made pursuant to an absolute liability created by a binding enforceable contract.

Respondent contends that the accrual and deduction of the amounts as of the end of the taxable year were not proper (1) because this method of accounting constituted a change in accounting methods for which the consent of the Commissioner was not obtained, (2) because part of the accrued liability had not become fixed by the end of the year, and (3) because the amount which was a fixed liability was deferred compensation which was not deductible until paid under the provisions of section 404.

Respondent argues that since petitioner had not prior to its fiscal year ended March 27, 1964, accrued on its books any amount for unused sick leave of employees, it changed its method of accounting

with respect to this item in its fiscal year ended March 27, 1965, when it began accruing its liability for payment to employees for unused sick leave. Petitioner states that it made no change in its accounting method. Prior to its 1964 agreement with the union representing its employees, its employees had not been entitled to reserve pay for unused sick leave and therefore it had no liability for payment to its employees for unused sick leave. The facts clearly support petitioner. Until April 1, 1964, petitioner's employees were not entitled to be paid for any unused sick leave and therefore petitioner had no liability for payments to employees for unused sick leave. Since petitioner kept its books and filed its returns on an accrual method of accounting, it was entitled to accrue, beginning in its fiscal year 1965, any amount of properly accruable liability to its employees for unused sick leave pay in the first year it had such a liability under its established accounting method.

Respondent in his brief admits that at March 27, 1965, and March 26, 1966, petitioner's liability to its employees for sick pay because of the preceding year's unused sick leave at the anniversary date of their employment was fixed both as to liability and the amount thereof. The accruals for the "nonforfeitable" sick pay were $181,853 for the fiscal year ended March 27, 1965, and $193,890 for the fiscal year ended March 26, 1966. Since all facts fixing this liability of petitioner and the amount thereof had occurred by the end of its fiscal years, the amounts are properly deductible. *Lukens Steel Co.*, 52 T.C. 764 (1969), affd. 442 F. 2d 1131 (C.A. 3, 1971). Respondent argues, however, that these amounts were in fact deferred compensation within the meaning of section 404 and therefore not deductible until actually paid. Petitioner in its reply brief points out that this is a new issue raised by respondent on brief. We agree with petitioner. Respondent disallowed petitioner's claimed deduction for accruals of sick pay solely on the ground that these items were not properly accruable and that these accruals constituted a change in petitioner's accounting method. We do not consider this issue under section 404 to be properly raised by the pleadings and therefore will not consider it.

The amounts of $127,638 for its fiscal year 1965 and $113.851 for its fiscal year 1966 accrued by petitioner as unpaid sick pay do not represent fixed liabilities as of the end of its taxable years. An employee's entitlement to payment for unused sick pay of the current year was contingent upon his continued employment unless he was terminated by petitioner for reasons other than proven or admitted dishonesty. Where an employee voluntarily terminated his employment or was discharged for admitted or proven dishonesty, his entitlement for payment for the current year's unused sick leave was forfeited.

The provisions for forfeiture of pay for the current year's unused sick leave in the event of voluntary termination or discharge for

proven or admitted dishonesty present a contingency which precludes the fixing of liability for unused sick pay as of the close of petitioner's taxable year. Liability for such unused sick pay does not become fixed until the employee actually becomes entitled to payment upon the anniversary date of his employment falling in the following year or the involuntary termination of his employment for reasons other than proven or admitted dishonesty.

Petitioner contends that since only the actions of the employee and not its actions could cause the employee to forfeit the pro rata portion of the sick pay, the liability so far as controlled by it is fixed. This argument is unpersuasive. It is not why the liability is not fixed that causes an item not to be a proper accrual but rather it is the fact that it is not a fixed liability that makes the accrual improper. See *Oberman Manufacturing Co.*, 47 T.C. 471 (1967), and *Turtle Wax, Inc.*, 43 T.C. 460, 466–467 (1965).

We hold that petitioner properly accrued and deducted the $181,853 and $193,890 of nonforfeitable employees' sick leave payments due but that it is not entitled to deduct the remaining $127,638 and $113,851 of accruals for sick pay for its fiscal years 1965 and 1966, respectively.

### 3. *Charitable Contribution Issue*

Section 170(a)[5] allows a deduction for any charitable contribution made within the taxable year. Respondent acknowledges the status of the Salvation Army as a charitable organization described in section 170(c)(2), and on brief concedes petitioner's right to a charitable deduction for the fair rental value of the penthouse. However, respondent takes the position that petitioner is entitled only to this deduction on a per annum basis and that since the only portion of petitioner's premises actually used by the Salvation Army during the years here in issue was the penthouse, petitioner is entitled to no deduction for

---

[5] SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.—There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.

\* \* \* \* \* \* \*

(c) CHARITABLE CONTRIBUTION DEFINED.—For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

\* \* \* \* \* \* \*

(2) A corporation, trust, or community chest, fund, or foundation—

(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State or Territory, the District of Columbia, or any possession of the United States;

(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes or for the prevention of cruelty to children or animals;

(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

(D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation.

any rental value of the theater and Gold Room. Respondent does not question the legal validity of the lease but contends that it has no validity for income tax purposes since the record shows that the Salvation Army had no need for the theater and Gold Room space and took that space solely at petitioner's behest since it made no payment therefor and it was only given the use of the penthouse if it also took the lease for the remaining space. Respondent also contends that as a practicable matter, petitioner was able to use the theater and Gold Room space for its own purposes when it needed to use the space and had a tacit understanding to this effect with the Salvation Army.

Petitioner contends that it is entitled to a deduction for a charitable contribution for the fair rental value of the theater, the Gold Room, and the penthouse since it had given the Salvation Army the legal right to the use of these premises through the lease. Petitioner further contends that it is entitled to the total deduction for the fair rental value for the term of the lease in the year the lease was entered into rather than for a series of contributions measured by the rental value for each year.

The record shows that the Salvation Army did use the penthouse as offices beginning in September 1964. We have determined from the testimony of petitioner's expert witness which was based on actual rentals charged for comparable office space in the same general area as petitioner's building that the fair rental value of the penthouse as office space was $12,000 a year.

The record shows that the theater had no fair rental value as a theater in the years here in issue. Petitioner established through an expert witness that the theater would have had a yearly fair rental value of $12,000 as a warehouse. However, under its lease the Salvation Army could not use the theater except as a theater since it could not remove the theater furnishings and fixtures unless it replaced them with furniture and fixtures of comparable value which would serve the same use as the furniture and fixtures removed. On the basis of this record the theater had no fair rental value for the use the Salvation Army was permitted to make of it under the lease. Therefore, whether we adopt petitioner's view that the right of the Salvation Army to use the premises under the lease or respondent's view of the actual use of the property controls its charitable deduction, the lease of the theater to the Salvation Army was without value.

The parties stipulated that the annual fair rental value of the Gold Room was $4,223 a year. This is apparently the value of this room as a meeting room, the function for which it was normally used.

The facts in this record clearly show that the Salvation Army had no need for the theater and the Gold Room when the lease was entered into but accepted the lease of these portions of petitioner's building in order to be given the use of the penthouse which it did need for office

space. The Salvation Army made no use of the Gold Room during the years here in issue and made little use of it in later years. The inference is clear that petitioner had free use and access to the Gold Room for large meetings which the record indicates was the only use that had ever been made of that room. As petitioner points out, generally the rights created by a lease of property to a charity and the value of the interest conveyed determine whether a charitable contribution has been made and the amount of the deduction. *John G. Allen*, 57 T.C. 12 (1971). However, this general rule does not preclude consideration of the facts in each case to ascertain whether the formal lease is in fact a contribution to the charity so that the taxpayer has shown itself to be entitled to a charitable deduction. Where the form of a transaction is not the substance of that transaction, the form is not controlling. The facts here indicate that the formal lease of the Gold Room to the Salvation Army did not confer on that organization any benefit other than enabling it to obtain the use of the penthouse. The facts further indicate that it was petitioner's idea that the Salvation Army accept a lease of the Gold Room when the Salvation Army wanted to obtain free use of the penthouse and that the sole reason for the lease of the Gold Room to the Salvation Army was to create for petitioner a charitable deduction. The facts also show that petitioner continued to use the Gold Room whenever it had need of the use of this room.

Considering all the facts here present, we conclude that the "charitable lease" of the Gold Room to the Salvation Army was not a contribution to that organization of property but merely a facade by which petitioner was attempting to obtain a charitable deduction without in fact parting with any substantive rights. We therefore conclude, based on all the facts here present, that petitioner is not entitled to a charitable deduction for the years here in issue for the fair rental value of the Gold Room.

A taxpayer who makes a charitable donation of present, immediate, and irrevocable interest in property is entitled to a charitable deduction in the year of the conveyance measured by the fair market value of the total gift. *Priscilla M. Sullivan*, 16 T.C. 228, 231 (1951), and *Mattie Fair*, 27 T.C. 866 (1957). However, where a taxpayer conveys to a charity less than a present, irrevocable interest in the property, the fair rental value of the property which the charity is permitted to use is deductible only on an annualized basis. *John G. Allen, supra* at 14; See *Passailaigue v. United States*, 224 F. Supp. 682 (M.D. Ga. 1963), and *Threlfall v. United States*, 302 F. Supp. 1114 (W.D. Wis. 1969).

Since the lease agreement between petitioner and the Salvation Army provided for revocation of the gift not only in the event of default of the terms and conditions by the lessee, but also upon the giving of 60 days' notice in the event petitioner sold the premises,

we conclude that the gift made by petitioner was not irrevocable. Petitioner had the right to regain the premises under a circumstance within its control. Because of this right of termination, petitioner is entitled to deduct the fair rental value of the donated property only on a yearly basis. *John G. Allen, supra.*

We therefore hold that in its fiscal year 1965 petitioner is entitled to deduct seven-twelfths of the annual fair rental value of the penthouse and to deduct the annual fair rental value of the penthouse in its fiscal year 1966. Petitioner is entitled to no deduction for its charitable lease of the theater or the Gold Room to the Salvation Army in either year here in issue.

Finally, respondent contends that petitioner is not entitled to a deduction for depreciation (under section 167) on the premises donated to the Salvation Army on which it is entitled to a deduction for a charitable contribution. Section 167 allows a deduction for depreciation of property used in the trade or business or held for the production of income. Petitioner did not use the premises donated to the Salvation Army in its trade or business and did not hold that property for the production of income. Rather, petitioner chose to donate the property by means of a charitable lease for the use of the Salvation Army. We therefore conclude that petitioner is not entitled to a deduction for depreciation on the penthouse while it was donated for the use of the Salvation Army.

We need not determine whether petitioner is entitled to deduct depreciation on the theater and Gold Room since respondent conceded on brief the right of petitioner to deduct depreciation on any part of the property which we hold not to contribute toward the charitable deduction claimed by petitioner.

We are unpersuaded by petitioner's argument that the holding of the Court in *Threlfall* v. *United States, supra* at 1120–1121, that the donation of property rent-free does not give rise to constructive income by analogy should entitle petitioner to a deduction for depreciation on the donated premises. A taxpayer must demonstrate that its claimed deduction comes within the specific provisions of a Code section authorizing such a deduction. *New Colonial Co.* v. *Helvering*, 292 U.S. 435 (1934). Petitioner has failed to make such a showing with respect to depreciation on the property it donated to charity since while the donation was effective petitioner was not using the property in its trade or business or holding it for the production of income.

*Decision will be entered under Rule 50.*